209 N.J. Super. 174 (1986)
507 A.2d 253
BOARD OF EDUCATION OF THE CITY OF PLAINFIELD, COUNTY OF UNION, A TYPE II SCHOOL DISTRICT, APPELLANT,
v.
SAUL COOPERMAN, COMMISSIONER OF EDUCATION, RESPONDENT.
BOARD OF EDUCATION OF THE BOROUGH OF WASHINGTON, APPELLANT,
v.
SAUL COOPERMAN, COMMISSIONER, STATE OF NEW JERSEY, DEPARTMENT OF EDUCATION, RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued January 7, 1986.
Decided March 25, 1986.
*179 Before Judges MICHELS, GAULKIN and STERN.
Victor E.D. King argued the cause for appellant Board of Education of the City of Plainfield (King, King & Goldsack, attorneys; Victor E.D. King, of counsel and on the brief).
Charlotte Kitler, Deputy Attorney General, argued the cause for respondent Saul Cooperman, Commissioner of Education (W. Cary Edwards, Attorney General of New Jersey, attorney; James J. Ciancia, Assistant Attorney General, of counsel; Charlotte Kitler, on the brief).
James W. Broscious argued the cause for appellant Board of Education of the Borough of Washington (Broscious & Cooke, attorneys; James W. Broscious, of counsel; Robert L. Schumann and Richard D. Fifield, on the brief).
The opinion of the court was delivered by MICHELS, P.J.A.D.
These cases involve challenges to certain policy guidelines for the admission to school of children with AIDS/ARC and HTLV-III antibody promulgated by the New Jersey State Board of Education through respondent Saul Cooperman, Commissioner of Education (Commissioner). Pursuant to these guidelines, the Commissioner has ordered that the Board of Education of the City of Plainfield (Plainfield Board) and the Board of Education of the Borough of Washington (Washington Board) each admit a kindergarten-aged child to regular classroom attendance within *180 its district. Both school boards have appealed the Commissioner's orders and have challenged the validity of the guidelines. These appeals, therefore, have been consolidated.
The Plainfield Board and the Washington Board contend generally that: (1) the guidelines promulgated by the Commissioner constitute administrative rules under this State's Administrative Procedure Act and, as such, they were not adopted in compliance with the terms of that act; and (2) the guidelines are invalid because they conflict with existing statutes and administrative regulations. With respect to this contention, it is specifically alleged that the guidelines conflict with this State's school laws, which grant local boards of education power to deal with the health and welfare of the student body, and with provisions of the New Jersey Administrative Code, which provide for the evaluation, classification and education of handicapped children and which place the responsibility therefor on district child study teams. The Washington Board further contends that the guidelines are arbitrary, unreasonable and premature.
To better understand the decision we reach today, we deem it necessary to initially set forth the background giving rise to each of these appeals.

The Plainfield Board Case
The Plainfield Board appeals from a decision of the State Board of Education, affirming an order of the Commissioner dated October 3, 1985, which directed that it immediately admit a child, identified only as I.C., "to regular classroom attendance in the same manner and [on] the same basis as [it] would admit any other child eligible for school attendance."
I.C. is a five year old female who is currently under the guardianship of the Division of Youth and Family Services *181 (DYFS).[1] The child has resided in Plainfield, New Jersey with her foster parent, Mrs. D.W., on a regular basis since March 16, 1982. Two months after I.C.'s birth on October 23, 1980, she was hospitalized and it was determined that she was "failing to thrive" due to inadequate parental care. Thereafter, the child became critically ill with infantile botulism and was subjected to intensive hospital treatments, which included blood transfusions. In 1982, I.C. was diagnosed as having Acquired Immune Deficiency Syndrome, which is more commonly known by its acronym, AIDS.
On October 13, 1983, I.C. was accepted into a pre-school program run by the Plainfield Board. However, approximately one month later, on November 17, 1983, I.C. was withdrawn at the school district's request, after it was learned that she had been diagnosed as having AIDS. In January of 1984, the Plainfield Board advised Mrs. D.W. that it had consulted I.C.'s treating physician, James M. Oleske, M.D., the Director of the Division of Allergy, Immunology and Infectious Diseases at University of Medicine and Dentistry of New Jersey, and was searching for an appropriate physician to render a second opinion as to the feasibility of the child returning to the pre-school program.
Lawrence D. Frenkel, M.D., a professor of Clinical Pediatrics and Director of the Division of Immunology, Allergy and Infectious Diseases at Rutgers Medical School was subsequently chosen by the Plainfield Board to render a second opinion as to the advisability and safety of I.C.'s admission to school. After reviewing I.C.'s medical records, Dr. Frenkel reported on March 2, 1984 that:
Dr. Olesky [sic] is The world's authority on childhood AIDS, and from the data I have, there is absolutely no reason to doubt the diagnosis. Using the therapeutic regime that Dr. Olesky is using, I.C. would be protected from the vast *182 majority of common infectious diseases that might strike the normal child. In terms of an infectious agent causally related to AIDS syndrome, to the best of our current knowledge it takes an extremely intimate interaction or blood transfusion to pass these infections. It is my strong opinion (and that of most of my colleagues around the United States who are following children with AIDS or involved with this disease on a research basis) that these children should not be kept out of schools and do not seem to pose a risk to other children in their environment. [Emphasis in original].
Notwithstanding the advice of both Dr. Oleske and Dr. Frenkel, indicating that I.C. should not be kept out of school, the Plainfield Board refused to readmit the child to its pre-school program. Instead, in March 1985, the Plainfield Board began providing I.C. with pre-school home instruction.
After the Plainfield Board became aware that it would have to address the problem of educating I.C. within its district, it sought the advice of the State Departments of Education and Health. On March 12, 1985, the Plainfield Board inquired of the Union County Superintendent of Schools whether there were any applicable State regulations regarding the enrollment of a public school student with AIDS. The Union County Superintendent responded that, as of March 20, 1985, there were no such regulations in existence. However, he advised that a policy statement on this subject was being sought from the Attorney General's office.
On June 5, 1985, I.C.'s foster mother initiated kindergarten registration at a Plainfield elementary school. Thereafter, the Plainfield Superintendent of Schools again sought the assistance of the Union County Superintendent on June 21, 1985, inquiring whether a policy statement concerning school-age children with AIDS had been secured from the State. However, as of June 1985, no such policy had been established.
While the Plainfield Board was awaiting advice from the State as to the enrollment of I.C., it began to collect information from other states which were dealing with similar problems. "Guidelines for Children with AIDS/ARC Who Are Attending School" were received from the Indiana State Board of Health and "Information and Guidelines on the Prevention of *183 Disease Transmission in Schools (AIDS)" were forwarded by the State of Connecticut. The Connecticut guidelines were modeled closely upon those promulgated by the Florida Department of Health and Rehabilitative Services. In addition, the Plainfield Board reviewed "A Special Report on Acquired Immunodeficiency Syndrome" prepared for the New York City schools.
On August 30, 1985, the State Commissioners of Health and Education jointly announced the adoption of policy guidelines for the admission to schools of children with AIDS. These guidelines entitled, "Admission to School of Children with AIDS/ARC or HTLV-III Antibody," were promulgated to county superintendents by Walter J. McCarroll, a representative of the Commissioner of Education, on September 3, 1985. The original policy guidelines were revised and reissued with attachments on or about October 25, 1985.
According to the Commissioner of Education, these policy guidelines are based upon epidemiological studies indicating "that AIDS is not transmitted through casual contact as would be present in a school environment." Pursuant to the guidelines, children with AIDS/ARC or HTLV-III antibody are required to be admitted to regular school attendance, unless the following exceptional conditions are evident:
a. The student is not toilet-trained or is incontinent, or otherwise is unable to control drooling.
b. The student is unusually physically aggressive, with a documented history of biting or harming others.
The revised guidelines further established the procedures to be followed by local boards of education seeking to exclude students with AIDS, specifically providing:
1. Any determination to exclude a child with AIDS/ARC who is enrolled or seeking enrollment in a school program shall be based solely upon conflicting medical opinion as specified in the state policy. When such conflicting opinion as to the admissibility of a child with AIDS/ARC exists, the school medical inspector on behalf of the board must submit all requested information as *184 contained in "AIDS Contested Admissions Referral Check List" and transmit same to the county superintendent of schools.
2. The county superintendent of schools will immediately notify the Assistant Commissioner for County and Regional Services of the need for a review by the Medical Advisory Panel and immediately transmit the information required by the above cited check list.
3. The Assistant Commissioner for Executive Services shall immediately request the designated official within the Department of Health to convene the Medical Advisory Panel at the earliest possible time and shall transmit the written documentation for panel consideration.
4. The review panel will consider the written documentation submitted by the local district and/or such personal testimony as may be necessary to render its determination.
5. It shall be the obligation of the local school board to immediately submit a request for panel review of contested cases. The Medical Advisory Panel shall, within a period of four weeks from the date of exclusion, render a written recommendation to the Commissioner of Education as to whether the district has met its burden of proof to deny admission of the child. Exceptions to the timeline shall be permitted for the Medical Panel based upon extenuating circumstances.
6. The written determination of the Medical Advisory Panel shall be transmitted to the Commissioner of Education. Upon his review of the panel findings, the Commissioner of Education shall either direct the immediate enrollment of the child into an appropriate educational setting or, if determined otherwise by the review panel, confirm the district's determination to exclude the child from such setting and direct an alternate program of education. Copies of this determination and the Medical Advisory Panel findings will be forwarded to the Commissioner of Health and the appropriate county superintendent of schools. [Emphasis in original].
On September 3, 1985, the same day that the original policy guidelines were forwarded to the Union County Superintendent of Schools, the Plainfield Board voted to continue to provide home instruction to I.C.,[2] pending completion of a child study team evaluation, thereby excluding her from regular kindergarten public school education. This child study team evaluation, by a school psychologist, a learning disability teacher consultant, *185 a speech therapist, a school social worker and a school physician, was initiated to ascertain if I.C. would be eligible for special education services, due to an educational handicap.[3] On October 4, 1985, the child study team rendered its full report which recommended that I.C. be classified as neurologically impaired.
In its report, the child study team concluded that the "most appropriate and least restrictive educational placement" for I.C. would be "a program for Neurologically Impaired students." In specifically addressing I.C.'s affliction with AIDS, Margaret E. Symonds, M.D., a neurologist and child study team member, recommended:
I.[C.] needs a structured program with input from a learning disability specialist. She should have individual speech therapy. Appropriate classroom placement would be a Pre-K-Handicapped Program, otherwise in view of her dyspnea, home instruction would be appropriate.
As this child is toilet trained and is of an unaggresive personality, she should not represent danger as a source of infection to other students or teachers handling her.
In response to the action by the Plainfield Board excluding I.C. from public school attendance, DYFS, as the child's guardian, filed a petition for relief and declaratory judgment with the Commissioner, pursuant to N.J.S.A. 18A:6-9, to determine the validity of the Plainfield Board's action. The petition alleged that I.C. had been illegally and unconstitutionally denied her right to a free public education. On September 9, 1985, the parties agreed that this petition would be "held in abeyance so long as the Plainfield Board of Education [remained] in full compliance with the procedures and policies established by the Commissioners of Health and Education for reviewing and *186 making determinations relative to school admission for children with AIDS/ARC."[4]
In accordance with this agreement and pursuant to the aforementioned guidelines, the Plainfield Board was directed by the Union County Superintendent of Schools to provide him with its medical reasons for excluding I.C. from its regular school program. On September 8, 1985, John E. Hampton, M.D., the school's medical inspector, provided a written medical report based upon his review of I.C.'s medical records. In this report addressed to both the Union County and Plainfield Superintendents of Schools, Dr. Hampton opined:
The child described in the medical records which you supplied me appears to be acutely and chronically ill. On the basis of her blood count alone, there is adequate evidence to support a statement that she is too sick to attend a public school. As a physician .. . I would certify this child as being eligible for home instruction on the basis of this medical record.
This report was supplemented by another rendered by Dr. Hampton on September 11, 1985. In this second report, completed after a review of the clinical medical records of I.C., the doctor further noted:
It is very likely that without addressing the very troublesome problem of possible transmission of AIDS from this child to her peers that there will be adequate grounds for exclusion solely based on the child's multiple handicaps and her overwhelming tendency to acquire bacterial and viral infections. In an ordinary preschool or elementary school classroom this child could expect to be exposed to impetigo, bacterial pharyngitis, chicken pox, herpangina, viral and bacterial gastroenteritis, influenza and a large number of variants of the common cold, any of which could be fatal to a child with markedly depressed immunity.
These reports were forwarded to a special panel of independent medical experts, appointed by the Department of Health, along with documentation from I.C.'s treating physician, Dr. Oleske. In August 1985, it was Dr. Oleske's opinion, both as Chairman of the New Jersey State AIDS Advisory Subcommittee and as the physician of I.C.:

*187 that she be allowed to matriculate in elementary school. Her recovery from AIDS has been sufficient [sic] that I feel she is well enough to attend school.
* * * * * * * *
In a school setting, I.C. does not pose a risk of transmission of the HLTV-III virus to other children or school staff.
In a subsequent written report rendered on September 26, 1985, Dr. Oleske outlined I.C.'s clinical medical improvement since 1982, concluding that "[s]he is one of a few children we have followed who ha[s] stabilized and appears clinically well enough to attend school."
The Medical Advisory Panel (Panel), chaired by Ronald Altman, M.D., the Assistant Commissioner of the State Department of Health in the Division of Epidemiology and Disease Control, met on September 13, 24 and 26, 1985 to consider whether I.C. should be allowed to attend school. During these sessions, the Panel had at its disposal the following documentation: (1) A letter from Dr. John E. Hampton, dated September 8, 1985; (2) A letter from Dr. John E. Hampton, dated September 11, 1985; (3) A letter from Dr. James M. Oleske, dated August 2, 1985; (4) A letter from Dr. James M. Oleske, dated September 26, 1985; (5) A psychological evaluation by Ellen Crowley, dated December 27, 1984; and (6) Another psychological evaluation by Dr. Sherwood Chorost, dated January 31, 1985. In addition, Dr. Hampton personally appeared before the Medical Advisory Panel on September 24, 1985. The Plainfield Board, however, had no contact with the Panel. The board was not requested to submit I.C.'s complete medical records and it was never advised that its medical inspector had made an appearance before the Panel.
After considering the documentation and testimony, the Medical Advisory Panel rendered an advisory letter to the Commissioner on October 2, 1985, which concluded:
The current medical data supplied to the Panel are that the child has no medical condition such as described in the recommendations. Reports of the child's behavior describe no tendencies toward behavior which could possibly be related to spread of infection. These data do not support exclusion of the child from school.
*188 Following the recommendation of the Medical Advisory Panel, on October 3, 1985, the Commissioner issued a decision directing the Plainfield Board to "immediately admit I.C. to regular classroom attendance in the same manner and [on] the same basis as [it] would admit any other child eligible for school attendance." In his decision, the Commissioner cautioned that although I.C. was "being evaluated for possible classification as educationally handicapped," the Plainfield Board could not use this as an excuse "for not placing I.C. in a regular classroom environment." The Plainfield Board responded to the Commissioner's order by requesting an additional 30 day period within which to achieve placement of I.C. Notwithstanding this request, an action to enforce compliance with the Commissioner's order was brought by the State on October 10, 1985 in the Superior Court, Chancery Division.
On October 15, 1985, prior to the return date of an order to show cause issued by the Chancery Division judge, the Commissioner responded to the notification of I.C.'s neurological impairment which he had received from the Plainfield Board, specifically noting:
In light of the fact that the least restrictive environment by regulation is a program in the school or the school district in whose attendance area the pupil resides, please be informed that your program placement recommendations will be required to meet the absolute letter and spirit of the law.
I would caution you that I.C., who has been determined by the Medical Advisory Panel not to be excludable from school, has an absolute right to a constitutionally guaranteed thorough and efficient education without restraint. Her continued exclusion is not in conformity with law nor with the policy guidelines established by the Department of Health which permitted such temporary exclusion only until such time as it had considered the reasons presented by your medical advisors to justify the exclusion. Now that the Medical Advisory Panel has reached its determination, you are reminded that under the special education regulations, a child being considered as potentially eligible for special education services must remain in his or her placement until such time as the evaluation is completed, the IEP is developed and an appropriate placement effectuated. In I.C.'s case, such placement should have been in a regular kindergarten classroom. Therefore, you are hereby directed to admit I.C. no later than Monday, October 21, 1985 to the regular kindergarten program which she would have attended and to which she was legally *189 entitled had the Department of Health's policy advisory on AIDS/ARC not been invoked.

In the alternative, and in light of your child study team's determination that I.C. is eligible for special education services you are hereby informed that you may by the same date place I.C. in a special education program consistent with the classification as determined by the evaluation. Since I am aware that your district has a special education program which is within the area of classification of I.C. and also within her age group, no external placement will be permitted which does not fully conform to the requirement of placing a child in the "least restrictive environment." [Emphasis supplied].
On October 17, 1985, the Plainfield Board appealed both from the policy guidelines promulgated by the Commissioner on September 3, 1985 and from the Commissioner's decision of October 3, 1985 directing that it admit I.C. to regular classroom attendance. In addition, the Plainfield Board made an emergent application to this court on October 23, 1985, seeking a stay of the pending proceedings to enforce the Commissioner's order. We denied this application and transferred the matter to the State Board of Education with the consent of both parties.
On October 15, 1985, the return date of the order to show cause, the Chancery Division judge determined that he had "jurisdiction over the matter for the limited purpose of enforcement without determining the validity of the Commissioner's order." He thereafter directed that the Plainfield Board immediately admit I.C. to classroom attendance. The execution of this order, however, was stayed until November 8, 1985. In the interim, the Plainfield Board moved before the Commissioner, pursuant to N.J.A.C. 6:2-1.16, for a stay of his order of October 3, 1985. Although the Commissioner denied this motion, he delayed enforcement of the order until the State Board of Education decided the matter on the administrative appeal.
On November 8, 1985, the State Board of Education determined that, in accordance with N.J.A.C. 6:2-1.14, "oral argument [was not] necessary in order for [it] to arrive at a fair determination in th[e] case." It concluded that the Commissioner's actions, in directing I.C.'s admission to school, had been proper, emphasizing that:

*190 due process of law does not require a trial type administrative hearing as to nonfactual issues. Trial procedure is not required on issues of law, policy or discretion. [Citations omitted]. Thus, once the medical determination was made that I.C.'s medical condition did not warrant excluding her from school, it was reasonable and within his authority for the Commissioner of Education to direct her admittance to school. [Citations omitted].
In affirming the propriety of the Commissioner's Order directing I.C.'s admittance to school, [the State Board] emphasize[s] that the questions of the child's classification as educationally handicapped and her appropriate placement are not before [it]. We, however, caution the Board that this child must be treated just like any other child who has been classified as eligible for special education services. [Citation omitted].
On November 13, 1985, the Plainfield Board appealed this final decision to this court and immediately moved for emergent relief. We stayed the order of the Commissioner, dated October 3, 1985, the final decision of the State Board of Education, dated November 8, 1985, and the order of the Chancery Division, dated October 31, 1985, pending appeal. Furthermore, we accelerated the appeal on our own motion and set it down for oral argument, along with the appeal by the Washington Board.

The Washington Board Case
The Washington Board similarly appeals from the policy guidelines promulgated by the Commissioner, relating to the admission of school-age children with AIDS/ARC or HTLV-III antibody. It additionally appeals from the Commissioner's order of November 4, 1985, directing it to admit a five year old child, identified as Jane Doe, to regular kindergarten classroom instruction.
Jane Doe and John Doe are, respectively, a five year old girl and a nine year old boy, who are currently under the legal guardianship of DYFS. In July of 1985, Mrs. Doe, a resident of Washington Borough, contacted the Superintendent of Schools in the borough to advise that she was in the process of adopting these children and wished to register them for school for the 1985-1986 term. Mrs. Doe indicated that she wished to enroll John Doe in fourth grade and Jane Doe in kindergarten and she further advised that the younger child had been diagnosed as *191 having AIDS-Related Complex, more commonly known as ARC. Jane Doe apparently acquired this condition perinatally, as the child was born to an intravenous drug user who transmitted the condition to her unborn child.
Upon learning of the imminent enrollment of both children, the Superintendent consulted Dr. Hampton, the school district's regular physician, in order to ascertain his opinion regarding their admission. In response to this request, on July 25, 1985, Dr. Hampton prepared a "commentary concerning a hypothetical situation involving the enrollment of a child into the Washington School System when that child is known to be afflicted with the ailment known as AIDS." In this letter, forwarded to the Superintendent, Dr. Hampton made the following pertinent observations:
If a child afflicted with this disorder were to enter a population of elementary school children, the theoretical risk of transmission of that disease to the other children would be for all practical purposes limited to possible transfer of the virus from one person to another through the medium of saliva. As stated above, there apparently are no proven cases of such a transmission, although it is theoretically possible.
The true risk in a hypothetical situation, such as that we are discussing, is to the afflicted child.
A preschool child leaving for the first time the protected environment of family and home is entering a veritable bacteriological and viral jungle. From the first day in school and for the rest of that child's life he or she will be daily challenged by a host of noxious agents attempting to destroy him. A child with an intact immune system will respond to this challenge by developing a fever and a variety of symptoms which accompany the immune system's development of antibodies which from that time on will erect a shield against similar infections in the future.
The child or adult afflicted with the syndrome known as AIDS has a partial or complete lack of ability to erect this antibody shield. It also appears that the ability to form antibodies decreases in direct proportion to the length of time which this condition has existed.
In summary, it would appear to me that at the present state of knowledge regarding the syndrome known as AIDS we would consider the introduction of an afflicted child into a public school kindergarten environment to be a clearly defined definite danger to that child's well being, health and life.
In light of this medical opinion, the Superintendent notified Mrs. Doe, by letter dated August 1, 1985, that Jane Doe would not be admitted to kindergarten because such "enrollment *192 would not be in the best interest of the child in question or the other students." On August 20, 1985, the Superintendent was sent a copy of a letter from Dr. Oleske. In this letter, Dr. Oleske advised that he had been Jane Doe's treating physician since February 1985, noting:
[I] consider her a case of ARC not full AIDS. In my opinion, and that expressed by the New Jersey State AIDS Advisory Committee to the Commissioner of Health, children like [Jane Doe] are not a public health risk to other pupils, staff and teachers. She should be allowed to matriculate in a normal public school setting.
* * * * * * * *
In summary, there is no medical or scientific reason to exclude [Jane Doe] from attending school.
Notwithstanding this advice, Jane Doe was precluded from entering kindergarten.
During this same period, the Washington Board was also considering the fourth grade enrollment of John Doe. On August 19, 1985, the Washington Borough Superintendent advised that "[p]ending ... receipt of a transfer card and a certificate of health signed by a physician indicating [John Doe] is not afflicted with the syndrome, he may not be registered." Malcolm Schwartz, M.D., provided such a statement on August 21, 1985, advising that John Doe "[did] not demonstrate any signs or symptoms of AIDS-Related Complex." Notwithstanding this medical advice, the Washington Board refused to permit John Doe to be enrolled in school based upon Jane Doe's medical condition.
The Washington Board's school physician, Dr. Hampton, examined John Doe on September 4, 1985 and, in a letter to the Superintendent dated September 5, 1985, noted that a prior physical examination had revealed "no evidence of impaired health." Notwithstanding this fact, and the fact that the doctor's own examination revealed "only a few abnormalities," the letter concluded:
Because the initial laboratory work done on this child appears to have been incomplete and because the tests which were done showed some evidence of a hematological abnormality it seems prudent to perform a more complete series *193 of studies on this child to more accurately evaluate the state of his immune system and his resistance to infection.
Although John Doe continued to be excluded from school pending receipt of the additional test results, a tutor was assigned to provide home instruction.
Due to the Washington Board's actions in denying both children admission to public schools, DYFS filed two separate petitions for declaratory judgment or other emergent relief with the Commissioner. The Washington Board, in addition to answering both petitions, forwarded to the Warren County Superintendent of Schools and the Attorney General's office correspondence from Dr. Hampton, indicating the district's reasons for refusing to admit both Jane and John Doe. However, the attorney for the Washington Board clearly indicated in his cover letter, dated September 10, 1985, that these letters "should not be construed as the preliminary step under the policy procedures with respect to AIDS children promulgated by the New Jersey State Department of Education."
As we pointed out in our discussion concerning the Plainfield Board case, on August 30, 1985, the Commissioner of the Department of Health issued his recommendations to the State Department of Education concerning the admissibility to school of children with AIDS/ARC or HTLV-III antibody. These recommendations were adopted by the Commissioner of Education who notified county school superintendents on September 3, 1985 that school-age children with AIDS/ARC or HTLV antibody should be permitted to attend school in regular classrooms so long as they are toilet trained, are not incontinent or otherwise unable to control drooling and are not unusually physically aggressive with a documented history of biting or harming others. On September 4, 1985, these guidelines were forwarded by the Warren County Superintendent to the Washington Borough Superintendent of Schools.
On September 24, 1985, the Washington Board was advised that Dr. Hampton had received medical reports indicating that further blood testing, which had been done on John Doe, *194 indicated that he was free of ARC, AIDS or HTLV-III antibodies. Based on this medical evidence, the Washington Board voted to admit him to regular school attendance under certain conditions. In a letter to Mrs. Doe's attorney, dated September 25, 1985, counsel for the Washington Board advised that:
upon submission to the Board of Education of an unqualified certificate by the physician attending "John Doe" stating that "there is no danger of `John Doe's' communicating AIDS or ARC" admission will be scheduled. In light of the concern by others, and assuming the certification is provided, admission will be scheduled for October 2, 1985.
In addition, Mrs. Doe was advised that, as long as John Doe was "a member of [a] household in which a member is ill with ARC or AIDS, a monthly certification by his attending physician to the effect that there is `no danger of his communicating AIDS or ARC'" would be required.
Notwithstanding the Washington Board's declination to adhere to the Commissioner's guidelines, the Medical Advisory Panel of the Department of Education was convened and met on September 24, 1985 to consider the admission of the Doe children. Dr. Hampton appeared before the Panel on this date and advised that, in light of recent blood test results, he had withdrawn his objection to John Doe's school attendance. Accordingly, by letter dated October 2, 1985, Ronald Altman, M.D., the Chairman of the Medical Advisory Panel, advised the Commissioner that John Doe "no longer falls within the jurisdiction of the Panel" since a disagreement about school admission no longer existed between the school and private physicians. In light of the Panel's report, on October 3, 1985, the Commissioner of Education directed the Washington Board to "to immediately admit John Doe to regular school attendance if it ha[d] not already done so." We were informed at oral argument that the boy had been admitted to school and was attending class.
The Medical Advisory Panel also met on September 13, 24 and 26, 1985 to consider the matter of the denial of school admission to Jane Doe. After these meetings, the Panel concluded that it lacked sufficient behavioral data upon which to *195 reach a decision. This behavioral data was apparently necessary to enable the Panel to determine if Jane Doe was subject to exclusion from school due to lack of toilet training, incontinency, uncontrolled drooling, physical aggressiveness or history of biting or harming others. Accordingly, thereafter the Panel was provided with a psychological evaluation of the child which had been performed by Dr. Alice S. Nadelman, at the behest of DYFS. After considering this behavioral data, in conjunction with previously supplied information, the Panel concluded in a letter to the Commissioner dated October 28, 1985 that:
On the basis of the data supplied to it, the Panel found no reason for exclusion of Jane Doe from school.
In addition, the Panel, after consideration of the information on Jane Doe, want[ed] to express its deep concern about the possible harm to this child caused by the exclusion from school and the entire episode. [The Panel] urge[d] that all possible steps be taken to have the child attend school as rapidly as possible.
In accordance with this recommendation, by letter dated November 4, 1985, the Commissioner directed the Washington Board "to enroll Jane Doe no later than Wednesday, November 13, 1985."
After a suit to enforce compliance with the Commissioner's order was initiated in the Superior Court, Chancery Division, on November 15, 1985 the Washington Board sought leave to appeal the Commissioner's order of November 4, 1985. We granted leave to appeal, pursuant to R. 2:2-3(b), and consolidated this case with an earlier appeal filed by the Washington Board challenging the validity of the policy guidelines promulgated by the Commissioner on September 3, 1985. The parties consented to bypassing the State Board by virtue of its prior actions.

Medical Background
According to the New Jersey Department of Health, Acquired Immunodeficiency Syndrome (AIDS) is the medical term used to describe clinical symptoms caused by the body's loss of ability to fight infection. Those afflicted with AIDS become *196 susceptible to a variety of rare illnesses, known as opportunistic infections, which do not generally occur in individuals whose immune systems are normal. The virus which has been identified as the probable cause of AIDS is the Human T-Lymphotropic Virus, Type III (HTLV-III). The antibodies to HTLV-III are almost universally present in AIDS cases and in persons with AIDS-Related Complex (ARC). "An Overview of Acquired Immunodeficiency Syndrome," New Jersey Department of Health.
The presence of HTLV-III antibodies is indicative of a prior infection by the HTLV-III virus. This means that the individual not only carries a current infection but also has the ability to infect others. Three categories of outcomes result from infection by HTLV-III. The first, AIDS, is the most severe form of HTLV-III infection. Of those individuals who develop AIDS, most die from the disease within two years. However, there have been cases where individuals have survived as long as five years. At present, there appears to be no cure for AIDS, although most infections associated with the disease can be treated. "AIDS: A Special Report on Acquired Immunodeficiency Syndrome," City of New York Department of Health.
The second outcome, AIDS Related Complex (ARC), is a milder degree of immunodeficiency. ARC conditions are those that do not result in AIDS, but are caused as a result of infection by HTLV-III. Some individuals with ARC, however, do develop a life threatening opportunistic infection. When this happens the person is then classified as having AIDS. ARC is most frequently characterized by swollen glands, weight loss, enlarged liver or spleen and frequent mild infections. Many pediatricians do not differentiate between AIDS and ARC in children. Ibid.
The final category of HTLV-III infection is an asymptomatic form. This form is the most common since most people who have been infected with HTLV-III do not develop any symptoms, yet are still able to transmit the infection.
*197 The HTLV-III antibody has been isolated from blood, semen, saliva or tears. "Education and Foster Care of Children Infected with Human T-Lymphotropic Virus Type III/Lymphadenopathy  Associated Virus," 34 Morbidity and Mortality Weekly Report of U.S. Center for Disease Control 517, 518 (August 30, 1985). However, transmission has not been documented from saliva and tears. The majority of infected children have acquired the virus either from their infected mothers in the perinatal period or through the transfusion of blood or blood products containing the virus. Ibid. Studies of family members of patients with HTLV-III infections have failed to demonstrate transmission to older children or adults who have not been in sexual contact with the infected individual. Because the HTLV-III virus is very fragile and does not live long when exposed on a surface, the chance of infection through toilet seats, books and papers or washed eating utensils and glassware has been eliminated. In addition, there are no cases documenting the spread of HTLV-III antibody through shared meals, beds or exposure to coughing or sneezing. "An Overview of Acquired Immunodeficiency Syndrome," New Jersey Department of Health.
As reported by the Center for Disease Control (CDC) of the United States Department of Health and Human Services:
As of August 20, 1985, 183 of the 12,599 reported cases of AIDS in the United States were among children under 18 years of age. This number is expected to double in the next year. Children with AIDS have been reported from 23 states, the District of Columbia and Puerto Rico, with 75% residing in New York, California, Florida and New Jersey. ["Education and Foster Care of Children Infected with Human T-Lymphotropic Virus Type III/Lymphadenopathy  Associated Virus," 34 Morbidity and Mortality Weekly Report of U.S. Center for Disease Control 517, 517 (August 30, 1985).
It has been acknowledged by the New Jersey Department of Health that there exist, within this State, a large number of pediatric cases of AIDS and ARC. Since 1980, a total of 43 *198 pediatric AIDS/ARC cases have been identified in New Jersey.[5] The age of these children has ranged from 6 months to 5 years. It is anticipated that the number of pediatric AIDS/ARC cases will be increasing in the future.
It has been medically recognized that children with an HTLV-III infection may run a greater risk of encountering infection in a school setting than at home. Id. at 519. Younger children and neurologically handicapped children prone to "mouthing toys" would be expected to be at a greater risk of acquiring infections. Accordingly, the CDC has recommended that decisions regarding the proper educational setting for HTLV-III infected children be based "on the behavior, neurologic development, and physical condition of the child, [as well as on] the expected type of interaction with others in that setting." Ibid. However, the CDC has further concluded that:
For most infected school-aged children, the benefits of an unrestricted setting would outweigh the risks of their acquiring potentially harmful infections in the setting and the apparent nonexistent risk of transmission of HTLV-III/LAV. These children should be allowed to attend school ... in an unrestricted setting.[6] [Ibid. (Footnote supplied)].
None of the identified cases of HTLV-III infection in the United States are known to have been transmitted in a school or day-care setting. Therefore, based on current epidemiological evidence, casual person-to-person contact (as would occur among school children) appears to pose no risk. However, there has been only limited study with respect to the risk of transmission through contact between younger children and neurologically handicapped children who lack control of their bodily secretions. Accordingly, the CDC has concluded that, "[b]ased on experience with other communicable diseases, a *199 theoretical potential for transmission would be greatest among these children." Ibid. Such theoretical transmission would most likely involve the exposure of open skin lesions or mucous membranes to the blood or other body fluids of an infected person. Consequently for infected preschool-aged children, some neurologically handicapped children who lack control of their bodily secretions or who exhibit aggressive behavior and those children with oozing lesions, the CDC has recommended a more restrictive school environment.
This view, however, has not been unequivocally accepted by the medical community. Dr. Lionel Resnick, M.D.,[7] a Research Associate in Dermatology and Pathology at Mt. Sinai Hospital in Miami, Florida and an Assistant Professor of Immunology and Microbiology at the University of Miami who has treated and consulted with patients infected with HTLV/LAV virus, ARC and AIDS, disagrees with the ultimate recommendation of the CDC indicating that young, school-age children should be admitted to classroom attendance unless they fall within certain defined exceptions. Dr. Resnick's disagreement with the CDC is, primarily, due to his belief that the data supporting its policy is: (a) tentative; (b) based upon a relatively small sampling; and (c) extremely new and, thus, lacking a long history. It is Dr. Resnick's view that:
First, we are presently lacking a sound base for any conclusions concerning children in a school setting. It is just now occurring that children are being placed in the elementary schools with HTLV-III, ARC and AIDS. The placement of young children in the elementary schools poses a two-fold problem which must be addressed. First is the risk of transmission of the virus from one child to another under those conditions, and secondly and equally important, is the risk to the child with AIDS or ARC. By placing these children in the elementary schools they are being exposed to the risk of numerous infectious diseases ... which the child[ren]'s immune system[s] may not be able to cope with.
Dr. Resnick is particularly troubled about children with these conditions being placed in the elementary school, because of the *200 present status of medical knowledge concerning the HTLV-III virus, and its modes of transmission. First, the doctor does not agree that the environment of children in primary, elementary school grades should be described as a casual setting, since he is not sure of the consequences of the children biting, being bitten, kissing or engaging in other such conduct. Dr. Resnick notes, for example, that there have been cases involving twins where one twin has been infected while the other has not. In the doctor's view, such cases would seem to suggest that many currently unexplained factors, either genetic or environmental, may become significant in future medical studies. Accordingly, based upon the present state of medical and scientific knowledge, it is Dr. Resnick's opinion that it is "far too premature" to admit young children infected by the HTLV-III virus or afflicted with ARC or AIDS into elementary school environments.

Validity of the Guidelines for the Admission to School with Children with AIDS/ARC and HTLV-III Antibody
We turn now to a consideration of whether or not the guidelines promulgated by the Commissioner constituted administrative rules, which should have been adopted in compliance with the Administrative Procedure Act, N.J.S.A. 52:14B-1 et seq. It is the contention of both the Plainfield and Washington Boards that the policy guidelines for the admission to school of children with AIDS/ARC or HTLV-III antibody, promulgated by the Commissioner on September 3, 1985, constitute administrative rules under the Administrative Procedure Act. This Act sets forth specific requirements which must be met before a State agency,[8] such as the Department of Education, may *201 exercise its rule-making power.[9] As defined within the Administrative Procedure Act, an "administrative rule" is
[an] agency statement of general applicability and continuing effect that implements or interprets law or policy, or describes the organization, procedure or practice requirements of any agency. The term includes the amendment or repeal of any rule, but does not include: (1) statements concerning the internal management or discipline of any agency; (2) intraagency and interagency statements; and (3) agency decisions and findings in contested cases. [N.J.S.A. 52:14B-2(e) (Emphasis supplied)].
Pursuant to the Administrative Procedure Act, prior to the adoption of any rule, an agency must:
(1) Give at least 30 days' notice of its intended action.[10] The notice shall include a statement of either the terms or substance of the intended action or a description of the subjects and issues involved, and the time when, the place where, and the manner in which interested persons may present their views thereon. The notice shall be mailed to all persons who have made timely request of the agency for advance notice of its rule-making proceedings and in addition to other public notice required by law shall be published in the New Jersey Register and shall be filed with the President of the Senate and the Speaker of the General Assembly. The notice shall be additionally publicized in such manner as the agency deems most appropriate in order to inform those persons most likely to be affected by or interested in the intended action. Methods that may be employed include publication of the notice in newspapers of general circulation or in trade, industry, governmental or professional publications, distribution of press releases to the news media and posting of notices in appropriate locations;

*202 (2) Prepare for public distribution at the time the notice appears in the Register a statement setting forth a summary of the proposed rule, a clear and concise explanation of the purpose and effect of the rule, the specific legal authority under which its adoption is authorized, and a description of the expected socio-economic impact of the rule;
(3) Afford all interested persons reasonable opportunity to submit data, views, or arguments, orally or in writing. The agency shall consider fully all written and oral submissions respecting the proposed rule.
The agency shall conduct a public hearing on the proposed rule at the request of a committee of the Legislature, or a governmental agency or subdivision, provided such request is made to the agency within 15 days following publication of the proposed rule in the Register. The agency shall provide at least 15 days' notice of such hearing, which shall be conducted in accordance with the provisions of subsection (g) of this section;
(4) Prepare for public distribution a report listing all parties offering written or oral submissions concerning the rule, summarizing the content of the submissions and providing the agency's response to the data, views and arguments contained in the submissions. [N.J.S.A. 52:14B-4(a)(1), (2), (3), (4) (Footnote supplied)].
Accordingly, the primary goal of the Administrative Procedure Act is "to permit greater public participation in and familiarity with administrative processes, by requiring advance notice of the intention to promulgate rules and by requiring notice of hearings containing information of assistance to participants in such hearings." Avant v. Clifford, 67 N.J. 496, 555 (1975) (quoting Veto Messages of Governor Richard J. Hughes 1965-69, p. 126, Sen. 667, Dec. 27, 1968). Such administrative measures have been viewed as "of inestimable value in promoting public understanding of and cooperation with the State Government." Ibid. Therefore, where agency policy is adopted internally, without proper promulgation and allowance for comment, it should not be binding, since there has been no opportunity for public input and no public awareness of the rule with which the public is supposed to comply.
There is no question that the formalities of the Administrative Procedure Act were not observed by the Commissioner of the Department of Education in promulgating the subject policy guidelines. Accordingly, we must consider various factors to determine if these guidelines are, in actuality, rules and, therefore, invalidly promulgated and of no force and effect.
*203 One of the most critical aspects of an administrative rule is that it have both "general applicability and continuing effect." Metromedia, Inc. v. Director, Division of Taxation, 97 N.J. 313, 328 (1984) (quoting N.J.S.A. 52:14B-2(e)). See, e.g., Crema v. New Jersey Department of Environmental Protection, 94 N.J. 286 (1983). It has been consistently recognized that such rules have a "widespread, continuing and prospective effect." Metromedia, Inc. v. Director, Division of Taxation, supra, 97 N.J. at 329. In addition, any determination by an agency which is intended to be applied "as a general standard and with widespread coverage and continuing effect can also be considered [as] an administrative rule," even if it is not expressly or impliedly authorized by the language of the enabling statute. Ibid. See also Crema v. New Jersey Department of Environmental Protection, supra, 94 N.J. at 301.
Rule-making is also implicated when agency action concerns "broad policy issues" affecting a large segment of the regulated or general public. Metromedia, Inc. v. Director, Division of Taxation, supra, 97 N.J. at 330; Crema v. New Jersey Department of Environmental Protection, supra, 94 N.J. at 301-302. This is evident from language in the Administrative Procedure Act itself which defines an administrative rule as action which "implements or interprets law or policy." N.J.S.A. 52:14B-2(e). Writing for the Supreme Court in Metromedia, Inc. v. Director, Division of Taxation, supra, Justice Handler recognized that "[i]t is particularly appropriate that parties affected by the proposed agency action have the opportunity to participate in the process leading to the agency determination." 97 N.J. at 330 (citing Bergen County Pines Hospital v. Department of Human Services, 96 N.J. 456 (1984)).
If an agency determination effects a material change in existing law, it may also be regarded as a rule. Metromedia, Inc. v. Director, Division of Taxation, supra, 97 N.J. at 330. See also Crema v. New Jersey Department of Environmental *204 Protection, supra, 94 N.J. at 302. As noted by Justice Handler:

This feature relates not only to fairness to the individual party actually before the agency but to other persons as well. When an agency's determination alters the status quo, persons who are intended to be reached by the finding, and those who will be affected by its future application, should have the opportunity to be heard and to participate in the formulation of the ultimate determination. [Metromedia, Inc. v. Director of Division of Taxation, supra, 97 N.J. at 330 (Emphasis supplied)].
See also Bergen County Pines Hospital, supra, 96 N.J. at 469; Crema v. New Jersey Department of Environmental Protection, supra, 94 N.J. at 303; Boller Beverages, Inc. v. Davis, 38 N.J. 138 (1962). Where the subject matter of an agency determination concerns matters that transcend those of individual litigants and involves matters of general administrative policy, rule-making procedures should be invoked. Metromedia, Inc. v. Director, Division of Taxation, supra, 97 N.J. at 331. See generally Dougherty v. Department of Human Services, 91 N.J. 1 (1982); Texter v. Department of Human Services, 88 N.J. 376 (1982). Cf. Bally Manufacturing Corp. v. New Jersey Casino Control Commission, 85 N.J. 325, 341-343 (1981) (Handler, J., concurring), appeal dismissed, 454 U.S. 804, 102 S.Ct. 77, 70 L.Ed.2d 74 (1981) (rule-making may be appropriate even when a proposed rule has special impact upon particular parties, as well as the public).
The Supreme Court has synthesized from the foregoing criteria that "an agency determination must be considered an administrative rule when all or most of the relevant features of administrative rules are present and preponderate in favor of the rule-making process." Metromedia, Inc. v. Director, Division of Taxation, supra, 97 N.J. at 331. Therefore, rule-making is warranted, if it appears that in "many or most" of the following circumstances the agency determination:
(1) is intended to have wide coverage encompassing a large segment of the regulated or general public, rather than an individual or a narrow select group; (2) is intended to be applied generally and uniformly to all similarly situated persons; (3) is designed to operate only in future cases, that is, prospectively; (4) prescribes a legal standard or directive that is not otherwise expressly *205 provided by or clearly and obviously inferable from the enabling statutory authorization; (5) reflects an administrative policy that (i) was not previously expressed in any official and explicit agency determination, adjudication or rule, or (ii) constitutes a material and significant change from a clear, past agency position on the identical subject matter, and (6) reflects a decision on administrative regulatory policy in the nature of the interpretation of law or general policy. [Id. at 331-332].
In balancing the relevant factors here, it is evident that the policy guidelines for the admission to school of children with AIDS/ARC or HTLV-III antibody constitute administrative rules which should have been adopted in compliance with statutory rule-making procedures. The policy guidelines were promulgated and distributed throughout the State to county superintendents to be forwarded to local school districts. Accordingly, it was clearly the intention of the Commissioner that these guidelines have wide coverage and apply similarly to all districts with school-age children with AIDS within their boundaries. In addition, the guidelines were to operate prospectively, beginning during the 1985-1986 school year.
Furthermore, the AIDS policy guidelines set forth directives which were neither contemplated nor expressly provided for in N.J.S.A. 18A:4-15 which sets forth the general statutory rule-making authority of the Department of Education. These guidelines clearly reflect a specific administrative policy which had not previously been set forth by the Department of Education. Given the standards enunciated in Metromedia, Inc. v. Director, Division of Taxation, supra, 97 N.J. at 331-332, it is clear that the guidelines should have been adopted in compliance with the Administrative Procedure Act.
The State argues that the AIDS guidelines were not promulgated by the Commissioner to establish a new policy but, rather, were instituted by him to insist that local school districts comply with existing regulations and statutes regarding the admission of children to school and the communicability of disease. See N.J.S.A. 18A:38-26 (school-age children may not be permanently excluded from school except as explicitly provided by law); N.J.S.A. 18A:40-10 (children with presumed *206 contagious disease must be admitted to school upon certification from board of health or treating physician); N.J.S.A. 26:4-2 and N.J.A.C. 6:29-4.3(d) (local school districts must abide by determinations of the Department of Health pertaining to the communicability and quarantine of diseased persons).
If it were, in fact, the intent of the Commissioner to enforce existing regulations rather than to institute new policy, this intent was not clearly expressed in the directive of September 3, 1985. With respect to his statutory authority to issue such policy guidelines, the Commissioner stated only:
Based upon the ... recommendations by the Commissioner of Health and my obligation under law to ensure the provision of a free, appropriate, and thorough and efficient education to all children of this state, local districts are notified that children with AIDS/ARC or HTLV-III antibody who meet the criteria for admission provided in the policy guidelines of the Department of Health shall be admitted to regular school attendance. [Emphasis supplied].
Since the guidelines contain no indication that they were promulgated in compliance with existing regulations and statutes, the Commissioner's position is not persuasive.
The Department of Education obviously felt that there was a special need for specific guidelines dealing with the admission to school of children with AIDS/ARC or HTLV-III antibody. Consequently, the Commissioner promulgated new policy guidelines on this subject. The fact that the disputed declarations were promulgated as policy guidelines, rather than as rules, is of no significance. The label given to administrative action should not be determinative if the substance of such action falls within the ambit of rule-making requiring compliance with N.J.S.A. 52:14B-2(e). See, e.g., Metromedia, Inc. v. Director, Division of Taxation, supra, 97 N.J. at 334 (Director of Division of Taxation's tax deficiency assessment constituted an administrative rule); Shapiro v. Albanese, 194 N.J. Super. 418, 425, 431 (App.Div. 1984) (circular letter sent by Department of Human Services to all counties was an administrative rule). There can be no doubt that the guidelines in question constitute an agency statement of general applicability which implements policy designed to assist all local school districts in dealing with *207 the admission of children with AIDS to public school educational programs.
It is the Commissioner's principal contention that the policy guidelines which he promulgated did not need to be adopted in accordance with the Administrative Procedure Act. In support of this position it is noted that the courts of this State have recognized that administrative agencies possess wide latitude in selecting the appropriate procedures to effectuate their regulatory duties and statutory goals. Metromedia, Inc. v. Director, Division of Taxation, supra, 97 N.J. at 333; In re Controlled Cable Corp., 95 N.J. 473, 485 (1984); In re Kallen, 92 N.J. 14, 24-25 (1983); Texter v. Department of Human Services, supra, 88 N.J. at 385; Shapiro v. Albanese, supra, 194 N.J. Super. at 430. However, this flexibility does not allow an agency to ignore the dictates of the Administrative Procedure Act. Accordingly, an agency's discretion in choosing the proceeding most suitable to achieve its regulatory arms is not unlimited. Metromedia, Inc. v. Director, Division of Taxation, supra, 97 N.J. at 334; Crema v. New Jersey Department of Environmental Protection, supra, 94 N.J. at 299. See also N.J.S.A. 52:14B-2(b), (c), (e). Moreover, the Supreme Court has recognized that:
When the agency is concerned with "broad policy issues" that affect the public-at-large or an entire field of endeavor or important areas of social concern, or the contemplated action is intended to have wide application and prospective effect, rulemaking becomes the suitable mode of proceeding. [Crema v. New Jersey Department of Environmental Protection, supra, 94 N.J. at 299 (Emphasis supplied)].
Therefore, despite the great breadth of the Commissioner's powers, Hinfey v. Matawan Regional Board of Education, 77 N.J. 514, 525 (1978), his duty to obtain faithful execution of the school laws, East Brunswick Twp. Board of Education v. East Brunswick, 48 N.J. 94, 100 (1966) and his obligation to ensure that statutory objectives are met, Robinson v. Cahill, 62 N.J. 473, 509 n. 9 (1973), cert. den. sub nom., Dickey v. Robinson, 414 U.S. 976, 94 S.Ct. 292, 38 L.Ed.2d 219 (1973), he may not avoid the procedural requirements of the *208 Administrative Procedure Act, if they are applicable. Instead, the Commissioner's duties must be exercised in compliance with the statutory procedural requirements of N.J.S.A. 52:14B-1 et seq.
The Supreme Court has recognized that the establishment of administrative policy through adjudication, without adherence to rule-making procedures, creates unnecessary problems. Crema v. New Jersey Department of Environmental Protection, supra, 94 N.J. at 300 n. 11. In such situations parties may be denied "fair notice or a reasonable opportunity to anticipate and prepare to address the policies that will govern the proceedings." Ibid. In addition, persons who are not before the agency "may have substantial interests at stake that can be affected by the adjudication but that are not adequately expressed or presented by the actual parties or fully considered by the agency." Ibid. Applying this reasoning, the Crema Court determined that conceptual approval of proposed developments without advance promulgation of regulatory standards by the Department of Environmental Protection, in compliance with rule-making procedures, were invalid since:
the public and any affected or interested parties were without any firm knowledge of the factors that the agency would deem relevant and that might influence its ultimate decision. [Accordingly,] [t]he public had no meaningful opportunity to shape the criteria that ultimately affected their interests. [94 N.J. at 302 (Emphasis supplied)].
The Commissioner's actions in promulgating the policy guidelines, without notice or time for public comment, did not evince a concern for the rights and interests of both the local boards of education and the children affected by them. Although generally an administrative agency of this State is not obligated to hold a formal, public evidentiary hearing on proposed regulations before adopting them, the Administrative Procedure Act does require that there be provided a timely opportunity for interested parties "to submit data and argument." Heir v. Degnan, 82 N.J. 109, 119 (1980). See N.J.S.A. 52:14B-4(a)(3). Cf. In re Monmouth Medical Center Rate Appeal, 185 N.J. Super. 20, 33-34 (App.Div. 1982) (due process *209 does not require individual hearings where agency seeks to establish rules and procedures generally applicable). Such an opportunity to submit data and present arguments was not afforded the public with respect to the guidelines challenged here. See N.J.S.A. 52:14B-4(a)(3).
An additional measure of the validity of an administrative regulation is "whether it is consistent with the expressed policy of the enabling statute and related legislation." Texter v. Department of Human Services, supra, 88 N.J. at 387. In 1984, the Legislature of this State found that:
a. The effective identification, diagnosis, care and treatment of persons who have contracted acquired immune deficiency syndrome, commonly known as "AIDS," is of paramount public importance;
* * * * * * * *
d. AIDS although first diagnosed in homosexual men is now striking so many groups such as drug users, hemophiliacs, persons who have received blood transfusions and Haitians, that its course is currently unpredictable;
e. The spread of AIDS may be impossible to stop because the AIDS organism can be dormant for months before it manifests symptoms and because the incubation period ranges from six months to two years;
* * * * * * * *
g. Resultingly, the outbreak of AIDS has reached alarming proportions because of its highly contagious nature with New Jersey ranking fourth in the nation of [sic] the number of reported cases. [N.J.S.A. 26:5C-2a, d, e, g].
The Legislature further found that:
researchers have no conclusive evidence regarding the detection, treatment, cure or prevention of AIDS; that many health care professionals are not yet familiar with the symptoms or treatment techniques of AIDS; that most victims are not aware that they have been exposed to AIDS and therefore, infect others; that accordingly, the magnitude of the AIDS outbreak has not yet been realized. [N.J.S.A. 26:5C-2].
Whether and how these findings bear on the policy questions at issue are matters which should be addressed by the Commissioner in framing applicable administrative rules.
It cannot be disputed that there exists a need for prompt review of the action of a local school district to determine whether any exclusion of an AIDS afflicted child is medically justified. However, this need does not absolve the *210 Commissioner from adhering to the mandates of the Administrative Procedure Act. The failure of both the Commissioner and the Department of Education to comply with the requirements set forth by our Legislature, with respect to the promulgation of agency rules, renders the policy guidelines here under review null and void and of no force and effect. N.J.S.A. 52:14B-4(d).
Accordingly, the subject policy guidelines, promulgated by the Commissioner of Education, are set aside and the matter is remanded with direction to the Commissioner to promulgate appropriate administrative rules, adhering precisely to the requirements of the Administrative Procedure Act. In view of this decision we need not consider the other grounds raised in support of the challenge to the validity of the disputed guidelines.

Validity of Orders Directing that I.C. and Jane Doe be Admitted to Regular Classroom Attendance.
As previously indicated, the Plainfield Board additionally appeals from the decision of the State Board of Education, affirming the Commissioner's order of October 3, 1985, which directed that I.C. be admitted to regular classroom attendance. The Washington Board, pursuant to leave of this court, also appeals from an order of the Commissioner, dated November 4, 1985, directing that Jane Doe be admitted to regular classroom instruction. Both Boards have challenged these orders on the ground that the underlying policy guidelines, pursuant to which they were issued, are invalid and of no effect.
In addition, the Plainfield Board contends that the order of October 3, 1985 was issued in violation of its right to "due process," as defined in statutory and code provisions governing controversies and disputes under the school laws. See N.J.S.A. 18A:6-9 et seq.; N.J.A.C. 6:24-1.1. et seq. Accordingly, the Plainfield Board requests that "this dispute be transmitted forthwith to the Office of Administrative Law for a hearing on *211 the merits of the Commissioner's contention that I.C. must be placed in school forthwith and for a hearing on the allegations brought by DYFS in its September 5th Petition of Appeal." Although not raised by the Washington Board, this argument applies to both of the Commissioner's orders which have been challenged by these appeals.
Our Legislature has clearly conferred upon the Commissioner the power "to hear and determine ... all controversies and disputes arising under the schools laws." N.J.S.A. 18A:6-9. The New Jersey Administrative Code sets forth the procedural framework for such determinations and provides that "a controversy or dispute arising under the schools laws" may be initiated before the Commissioner by filing a petition with him. N.J.A.C. 6:24-1.2. After service of the petition is effectuated, the respondent is given 20 days to file and serve an answer. N.J.A.C. 6:24-1.4. After respondent's answer has been filed, or the time for doing so has expired, the Commissioner may summon the counsel for the parties or the parties pro se to:
appear before him at a conference for the purpose of eliminating or simplifying issues, obtaining admissions of fact or of documents that will avoid unnecessary proof, arriving, if possible, at an agreement of facts, and otherwise expediting the determination of the controversy. The commissioner may require the parties to submit written statements, verified by oath, as to the facts involved in any controversy or dispute, and may further require the submission of certified copies of all documents necessary to a full understanding of the question. In addition to the aforementioned items, the conference shall include, but not be limited to, such matters as discovery procedures, interlocutory proceedings, subpoena requirements, witnesses, pupil witnesses and their sequestration, submission of briefs or memoranda of law, order of proceedings, and other matters which may be pertinent. [N.J.A.C. 6:24-1.9(a) (Emphasis supplied)].
Here, despite the fact that DYFS had requested conferences "on an expedited basis" in both the Plainfield and Washington Board matters, the Commissioner never summoned either party to appear before him for such purposes.
Additionally, the Administrative Code provides that, if the parties and the Commissioner are not able to agree on a statement of the material facts, the Commissioner shall order a *212 hearing at which the parties will be "afforded [an] opportunity for [the] submission of oral testimony and documentary evidence." N.J.A.C. 6:24-1.11. At such hearing:

All evidence, including any records, investigations, reports and documents in the possession of the commissioner of which he desires to avail himself in making a decision, shall be offered and made a part of the record in the proceeding, and no other factual information or evidence shall be considered except that the commissioner may take official notice of any fact which may be judicially noticed by the courts, and in addition, may take official notice of general, technical, or scientific facts within his specialized knowledge. Parties shall be notified of the material so noticed, and they shall be afforded a fair opportunity to refute the facts so noticed. The requirements of this rule shall not apply to cases in which the truth of the particular fact or matter is admitted, or to a determination of appropriate relief. [N.J.A.C. 6:24-1.14 (Emphasis supplied)].
This provision of the Administrative Code is consistent with N.J.S.A. 18A:6-20, which provides that, when a hearing is held before the Commissioner, both parties "have the right to testify, and produce witnesses to testify on [their] behalf and to cross-examine witnesses produced against [them]." Furthermore, N.J.S.A. 18A:6-24 provides:

Testimony as to the facts involved in any controversy or dispute in which the commissioner has jurisdiction shall, if so required by the commissioner, be presented by the parties in the form of written statements verified by oath and accompanied by certified copies of all official documents, and the original or verified copies of all other documents, necessary to a full understanding of the questions involved. [Emphasis supplied].
It is uncontroverted that the Commissioner afforded neither the Plainfield Board nor the Washington Board the opportunity to be heard, to present witnesses, or to cross-examine the witnesses produced against it. We agree with the Commissioner that "a plenary evidentiary hearing is not required by statute on every controversy and dispute presented for [his] determination." However, here, because of the impingement upon the fundamental rights of the individual children and the important public issues implicated, the Commissioner should have afforded the parties an opportunity to be heard and present evidence, including oral testimony of medical experts, with respect to the exclusion of I.C. and Jane Doe from regular classroom attendance.
*213 Notwithstanding that there is medical and scientific opinion which indicates the nonexistent risk of transmission of AIDS/ARC and HTLV-III antibody and supports the Commissioner's decisions requiring that these children be permitted to attend school, the ends of justice have clearly been frustrated by the Commissioner's refusal to comply with statutory and code requirements dealing with school law controversies and disputes. It is important to recognize that the Commissioner promulgated the subject policy guidelines in violation of the provisions of the Administrative Procedure Act, N.J.S.A. 52:14B-1 et seq., and without the opportunity for public comment or the presentation of any medical testimony. Thus, neither the promulgation of the guidelines nor the issuance of the orders under review complied with applicable procedural requirements or involved any proceeding which accorded the public, in general, and the litigants, in particular, fundamental due process.
Furthermore, contrary to the Commissioner's claim, the proceedings before the Medical Advisory Panel did not satisfy even minimal requirements of due process. First, these proceedings were not held in response to issues raised in the DYFS petitions or pursuant to either the provisions of the Administrative Code or the school laws. See N.J.A.C. 6:24-1.1 et seq.; N.J.S.A. 18A:6-9 et seq. Second, the Medical Advisory Panel, which was organized and convened solely pursuant to the challenged policy guidelines, only heard Dr. Hampton's oral testimony and considered his reports along with those of Dr. Oleske and the two psychologists, without affording any of the parties the right to present witnesses or cross-examine the medical experts with respect to their written reports.
Accordingly, the decision of the State Board of Education that affirmed the order of the Commissioner, dated October 3, 1985, directing the Plainfield Board to admit I.C. to regular classroom attendance, and the order of the Commissioner, dated November 4, 1985, directing the Washington Board to admit Jane Doe to regular kindergarten classroom instruction, are *214 reversed and the matters are remanded to the Commissioner for appropriate hearings and redeterminations.

Status of I.C. and Jane Doe Pending Further Action by the Commissioner
Our determination that the policy guidelines are invalid and unenforceable because they were not promulgated in accordance with the mandates of the Administrative Procedure Act and that the orders of the Commissioner be reversed because of his failure to accord the local boards procedural due process, does not end our responsibility in these cases. Still to be determined is whether I.C. and Jane Doe should be admitted to regular classroom attendance pending the repromulgation of the guidelines as administrative rules and the redetermination of the DYFS petitions.
The entitlement of children of our State to a thorough and efficient system of education has been recognized as a fundamental right guaranteed by the New Jersey Constitution. Robinson v. Cahill, 67 N.J. 333, 347 (1975), cert. den. sub nom., Klein v. Robinson, 423 U.S. 913, 96 S.Ct. 217, 46 L.Ed.2d 141 (1975). This right is found within the Education Clause which states:
The Legislature shall provide for the maintenance and support of a thorough and efficient system of free public schools for the instruction of all children in the State between the ages of five and eighteen years. [N.J.Const. (1947), Art. VIII, § IV, par. 1].
Accordingly, our Constitution clearly commands that "an equal educational opportunity" be afforded to all public school children in the State. Robinson v. Cahill, 69 N.J. 133, 140 (1975), cert. den. sub nom., Klein v. Robinson, 423 U.S. 913, 96 S.Ct. 217, 46 L.Ed.2d 141 (1975), vacated on other grounds, 69 N.J. 449 (1976).
There can be no dispute regarding the importance of education in our society. It has been recognized that:
Today education is perhaps the most important function of State and local governments. Compulsory school attendance laws and the great expenditures *215 for education both demonstrate our recognition of the importance of education to our democratic society. It is required in the performance of our most basic public responsibilities, even service in the armed forces. It is the very foundation of good citizenship. Today it is a principal instrument in awakening the child to cultural values, in preparing him for later professional training, and in helping him to adjust normally to his environment. In these days, it is doubtful that any child may reasonably be expected to succeed in life if he is denied the opportunity of an education. [Brown v. Board of Education of Topeka, 347 U.S. 483, 493, 74 S.Ct. 686, 98 L.Ed. 873, 880 (1954) (Emphasis supplied)].
Where appropriate, children, such as I.C. and Jane Doe, should receive their education in a regular classroom setting, in school. Although a child's chance in society is through the educational process,
[a] major goal of the educational process is the socialization process that takes place in the regular classroom, with the resulting capability to interact in a social way with one's peers. It is therefore imperative that every child receive an education with his or her peers insofar as it is at all possible. This conclusion is further enforced by the critical importance of education in this society.
It is an educational fact that the maximum benefits to a child are received by placement in as normal [an] environment as possible ... A child has to learn to interact in a social way with [his] peers and the denial of this opportunity during his minor years imposes added lifetime burdens. ... [Hairston v. Drosick, 423 F. Supp. 180, 183 (S.D.W. Va. 1976) (Emphasis supplied)].
On the other hand, classmates, faculty and staff have an equally important interest in being reasonably free from the risk of exposure to contagious disease which may be spread by students attending public schools.
These competing interests are reflected in both our school and health laws. See e.g., N.J.S.A. 18A:38-26 (prohibiting the temporary or permanent exclusion from school of any child "except as explicitly otherwise provided by law"); N.J.S.A. 18A:40-7 (according principals the right to exclude from their schools pupils evidencing a "departure from normal health" upon recommendation of the school physician or nurse); N.J.S.A. 18A:40-8 (according principals the right to exclude from their schools, upon recommendation of the school physician or nurse, any pupil who has been exposed to communicable disease or whose presence in school has been certified as *216 detrimental to the health of other pupils); N.J.S.A. 18A:40-10 (requiring admission to school of a teacher or child who is a member of a household in which a person is ill with a "contagious or infectious disease" upon certification from the "board of health, or from the physician attending such person" that all danger of communicating disease by the teacher or pupil has passed); N.J.S.A. 26:4-6 (giving those "having control of [a] public school" power to "prohibit the attendance of any teacher or scholar" for a specified time to prevent the spread of communicable disease); N.J.S.A. 26:4-2 and N.J.A.C. 6:29-4.3(d) (requiring local school boards to abide by the determinations of the Department of Health in matters pertaining to the communicability and quarantine of persons infected with communicable disease). Thus, in each instance where a child infected with disease or afflicted with illness has been prevented from attending school, there must be a careful examination to determine whether the exclusion was proper. Such an examination has never been made here.
The Plainfield and Washington Borough Boards, in the exercise of their statutory duty under our school laws to preserve and promote the health of pupils in their respective public school systems, have determined not to admit I.C. and Jane Doe to classroom attendance. See N.J.S.A. 18A:40-6 et seq. The Commissioner effectively overturned these decisions, without affording either the Plainfield Board or the Washington Board the opportunity to be heard, to present witnesses and to cross-examine the witnesses produced against them on the important and controversial public issues involved. Based on the reports of Dr. Hampton, the medical inspector for both school boards, and the certification of Dr. Resnick, which was presented by the Washington Board on appeal, we believe that there has been a sufficient showing of a potential risk of exposure to contagious disease to warrant hearings prior to the admission of I.C. and Jane Doe to classroom attendance.
*217 Furthermore, given the constitutional right of these children to an education and because they are still not being educated in an appropriate classroom setting, we direct that the Commissioner hold these hearings immediately, affording all parties the opportunity to be heard and to present evidence, including oral testimony, as each may deem appropriate and necessary. We further direct that the hearings be conducted on a continuous, day-to-day basis until completed.
Accordingly, we hereby continue our prior orders staying the admission of I.C. and Jane Doe to regular classroom attendance, pending hearings and redetermination of these matters by the Commissioner. We do not retain jurisdiction.
GAULKIN, J.A.D., concurring in part and dissenting in part.
I join in the majority's holding that the AIDS policy guidelines "constitute administrative rules which should have been adopted in compliance with statutory rule-making procedures." Ante at 205. Accordingly, I concur in the order of remand to the Commissioner for the promulgation of appropriate administrative rules. However, I find myself unable to agree to the balance of the relief granted by my colleagues.

I.
The majority first orders that the Commissioner shall "immediately" conduct plenary evidentiary hearings to redetermine the DYFS petitions to admit the children to school. In those hearings, to be conducted before the adoption of administrative rules, the parties will presumably be free to explore all of the epidemiological evidence and expert opinions as well as the policy considerations which may be urged to be applicable. Those, of course, are the very same matters that will be considered in the rule-making process. It seems to me wasteful and unnecessary to require the Commissioner to address those issues in duplicative proceedings. More important, the issues are not properly resolved in adjudicative proceedings. As the *218 majority itself recognizes, the broad policy questions implicated here, of wide application and affecting the public at large in an important area of public concern, are most appropriately addressed in a rule-making procedure with wide public access. Ante at 207; Crema v. New Jersey Dep't of Environmental Protection, 94 N.J. 286, 299 (1983).
The Plainfield and Washington Boards are surely entitled to be heard on the DYFS petitions, as the majority holds. But once administrative rules have been properly promulgated, the scope and focus of those hearings will be narrowed and particularized. The most pragmatic and proper procedure, I suggest, would be to remand the DYFS petitions for appropriate hearings and determinations, as my colleagues have directed, but to permit the Commissioner to stay those hearings pending the promulgation of administrative rules, subject to the parties' rights to apply to vacate any such stay if the rule promulgation proceedings are not promptly pursued.

II.
I also disagree with my colleagues' conclusion that "there has been a sufficient showing of a potential risk of exposure to contagious disease to warrant hearings prior to the admission of I.C. and Jane Doe to classroom attendance." Ante at 216. That conclusion is wholly unsupportable.
In our assessment of the record, we must start with what the majority recognizes is the clear command of our Constitution that all public school children be afforded "an equal educational opportunity." Ante at 214. Both children involved in these proceedings were denied that right without the opportunity to be heard, to present witnesses or to cross-examine witnesses against them on the important and controversial public issues involved. My colleagues find it improper for the Commissioner to have ordered the children to be admitted to school without affording the Boards any of those procedural rights, (ante at 212); surely it is equally improper for the Boards, or this *219 court, to abridge the children's constitutional rights without a soundly based showing.
The majority opinion fairly and thoroughly recites the facts. The Plainfield Board initially barred I.C. from school without even the semblance of a medical opinion and in disregard of the opinions of Dr. Oleske, I.C.'s treating physician and a recognized world authority on childhood AIDS, and Professor Frenkel, whose opinion had been solicited by the Board. Not until months later, after the guidelines had been promulgated, did the Board obtain reports from Dr. Hampton to support the decision it had already made. Those reports noted the potential dangers of school attendance to the AIDS-afflicted child, but offered no opinion that AIDS was communicable in the school setting. In Jane Doe's case, the Washington Board supported its denial of her admission to school solely with Dr. Hampton's report. In addition to pointing out the dangers to the AIDS-afflicted child herself, that report commented only that transmission of AIDS in a school setting is "theoretically possible" although "there apparently are no proven cases of such a transmission."
Those proofs do not constitute even a prima facie showing that either of these children represented a threat to the health of others in the school setting. The Boards' showing was only marginally enhanced by the certification of Dr. Resnick, who expressed uncertainty about the epidemiological evidence because it is new, tentative and based upon a small sampling.
To be weighed against that "showing" is the epidemiological evidence reported by the Center for Disease Control and accepted by the New Jersey Department of Health as well as by similar agencies in Florida, Connecticut, Indiana and New York City and by the American Academy of Pediatrics. Indeed, the record before us suggests that every responsible agency that has spoken on the issue has come to essentially the same conclusion reached by the New Jersey Department of Health and adopted by the Commissioner, i.e., that "casual person-to-person *220 contact as would occur among school-children has not been demonstrated to pose a health risk to non-infected children or teachers." Significantly, none of the parties has referred us to any scientific literature which reaches a contrary conclusion. And, in addition to the general epidemiological evidence and expert opinion, the Medical Advisory Panel, examining the specifics of these cases, found no reason to exclude I.C. or Jane Doe from school attendance.
No matter how indulgently this record is read, it thus cannot support my colleagues' finding of "a sufficient showing of a potential risk of exposure to contagious disease" to require that I.C. and Jane Doe be excluded from school pending the further administrative proceedings. The Boards have made no showing at all, much less a sufficient one, to justify the continued infringement of the constitutional rights of these children. On this record, to bar the children from school until "applicable procedural requirements" (ante at 213) are satisfied is to turn due process on its head.
I would order that I.C. and Jane Doe be admitted to school while the administrative proceedings take their course.
NOTES
[1] By court order entered on May 2, 1985, the parental rights of I.C.'s natural parents were terminated and she was committed to the guardianship of DYFS pursuant to N.J.S.A. 30:4C-15.
[2] From September 5, 1985 to the present date, I.C. has been receiving two hours of home instruction per day from a certified teacher of the handicapped who is also a registered nurse.
[3] Pursuant to N.J.A.C. 6:28-2.1(a) and N.J.A.C. 6:28-3.1(a), an individualized education program to assure a free, appropriate public education to all handicapped school-age children in the least restrictive environment, must be developed by the child study team.
[4] The Plainfield Board alleges that no action of any kind has been taken with respect to this petition which is "still pending without disposition at this juncture."
[5] As of October 1985, 800 AIDS cases were identified in New Jersey, with 500 deaths resulting therefrom. The majority of cases have been identified in the northeastern part of the state in Essex, Hudson, Union, Passaic, Bergen and Middlesex counties.
[6] This recommendation has been endorsed by the American Academy of Pediatrics.
[7] A certification by Dr. Resnick was presented to this court, by the Washington Board, on this appeal.
[8] The Administrative Procedure Act defines a "state agency" as any "of the principal departments in the executive branch of the State Government, and all boards, divisions, commissions, agencies, departments, councils, authorities, offices or officers within any such departments." N.J.S.A. 52:14B-2(a).
[9] This rule-making power is found within N.J.S.A. 18A:4-15 which provides that the State Department of Education may "make and enforce ... rules for its own government and for implementing and carrying out the school laws of this state under which it has jurisdiction." Accordingly, there can be no dispute that the Department of Education "enjoys broad legislative rule-making powers." D.S. v. East Brunswick Twp. Board of Education, 188 N.J. Super. 592, 598 (App.Div. 1983), certif. den., 94 N.J. 529 (1983).
[10] If the agency finds that there is "an imminent peril to the public health, safety, or welfare [which] requires adoption of a rule upon fewer than 30 days' notice," it may "proceed without prior notice or hearing or upon any abbreviated notice or hearing ... to adopt the rule." N.J.S.A. 52:14B-4(c). However, this may only be done upon written application to and approval by the Governor and any rule promulgated in this matter is not effective for more than 120 days "unless repromulgated in accordance with normal rule-making procedures." Ibid.