BOARD OF EDUCATION OF THE CITY OF PLAINFIELD, COUNTY OF UNION, A TYPE II SCHOOL DISTRICT, RESPONDENT, v. SAUL COOPERMAN, COMMISSIONER OF EDUCATION, APPELLANT.

BOARD OF EDUCATION OF THE BOROUGH OF WASHINGTON, RESPONDENT AND CROSS-APPELLANT, v. SAUL COOPERMAN, COMMISSIONER, STATE OF NEW JERSEY, DEPARTMENT OF EDUCATION, APPELLANT AND CROSS-RESPONDENT.

Argued October 21, 1986—Decided April 15, 1987.

588

*Andrea M. Silkowitz,* Deputy Attorney General, argued the cause for appellant and cross-respondent (*W. Cary Edwards,* Attorney General, *James J. Ciancia,* Assistant Attorney General, of counsel, *Charolette Kitler,* former Deputy Attorney General, on the briefs).

*James W. Broscious,* argued the cause for respondent and cross-appellant (*Broscious & Cooke,* attorneys, *Richard D. Fifield,* on the briefs).

*Victor E.D. King,* argued the cause for respondent (*King, King & Goldsack,* attorneys).

The opinion of the Court was delivered by

HANDLER, J.

Acquired Immune Deficiency (AIDS) is a disease that disables the body from fighting infection. The cause of the disease is infection by the Human T-Lymphotropic Virus, Type III (HLTV-III, also known as Human Immunodeficiency Virus (HIV)). Three categories of outcomes result from infection by HTLV-III. The first, AIDS, is the most severe form of the infection; and most victims of the disease die within two years. The second possible form of infection is AIDS–Related Complex (ARC), a milder degree of immunodeficiency. The third and most common form of infection is asymptomatic, resulting in no abnormal infections.[1]

---

[1] A recent summary of scientific knowledge regarding AIDS included the following facts:

> More than 30,000 cases of acquired immune deficiency syndrome have been reported in the United States since 1981, when the disease was first identified. More than half the patients have died. Most victims in this country have been homosexual men and intravenous drug abusers.
>
> \* \* \* \* \* \* \* \*

I.

On August 30, 1985, the State Commissioners of Health and Education jointly announced the adoption of policy guidelines for the admission to schools of children with AIDS, ARC, or HTLV–III antibody. These guidelines were promulgated by a representative of the Commissioner of Education (Commissioner) to county school superintendents on September 3, 1985.

According to the Commissioner, these policy guidelines were based upon epidemiological studies indicating "that AIDS is not transmitted through casual contact as would be present in the school environment." Pursuant to these guidelines, children with AIDS/ARC or HTLV–III antibody were required to be admitted to regular school attendance, unless the following exceptional conditions were evident:

a. The student is not toilet-trained or is incontinent, or otherwise is unable to control drooling.

b. The student is unusually physically aggressive with a documented history of biting or harming others.

---

While much remains to be learned about AIDS, scientists assert with confidence that studies of victims and disease patterns have provided a clear picture of how the virus has spread in this country, and how it has not.

Many studies have documented the spread of the AIDS virus to an uninfected person though anal or vaginal intercourse with an infected person; through exchanges of blood, such as on contaminated hypodermic needles; from infected mothers to their infants before or during birth, and possibly through breast-feeding of infants.

Many studies have shown that people do not become infected with the AIDS virus as a result of routine, nonintimate contacts in the home or workplace.

 \*   \*   \*   \*   \*   \*   \*   \*

Experts say it is theoretically possible [for human bites to transmit AIDS], but they know of no such cases.

["Fact, Theory and Myth on the Spread of AIDS," New York Times, Feb. 15, 1987, at 1, col. 4.]

No child is known to have contracted AIDS in school or in a day care center. "Education and Foster Care of Children Infected with Human T–Lymphotrophic Virus Type III/Lymphadenopathy-Associated Virus," 34 *Morbidity and Mortality Weekly Rep.* 517, 519 (1985).

The guidelines also established a Medical Advisory Panel (MAP or Panel), comprised of independent medical experts appointed by the Board of Health, to review local school board decisions to exclude a child. In reaching its decision, the Panel was empowered to consider written statements of reasons as well as other "written documentation submitted by the local district and/or such personal testimony as may be necessary." The Panel was required to render a written recommendation to the Commissioner of Education "as to whether the district has met its burden of proof to deny admission of the child."

The present case results from the efforts of two local school boards to exclude students with AIDS or ARC from the classroom. On September 3, 1985, the Plainfield Board of Education excluded from its preschool program a female child named "I.C." The child was diagnosed as having AIDS and was living in foster care under the guardianship of the Division of Youth and Family Services (DYFS).

The Plainfield Board initially sought the opinion of James M. Oleskie, M.D., the Director of the Division of Allergy, Immunology, and Infectious Diseases at the University of Medicine and Dentistry of New Jersey, who served as I.C.'s treating physician. On receiving Dr. Oleskie's recommendation that I.C. be admitted to the classroom, the School Board sought a second opinion, this time of Lawrence F. Frenkel, M.D., a professor of Clinical Pediatrics and Director of the Division of Immunology, Allergy and Infectious Diseases at Rutgers Medical School. Dr. Frenkel's report concluded, "it is my strong opinion that the students should not be kept out of schools and do not seem to pose a risk to other children in their environment." Notwithstanding these reports, the school board continued to exclude I.C. from its pre-school program.

The Plainfield Board next assembled a "Child Study Team" comprised of a psychologist, a learning disability consultant, a speech therapist, a school worker, and a physician, to ascertain whether I.C. should be eligible for special education. Pending

completion of the Study Team's report, I.C. was excluded from regular kindergarten education and received two hours of home instruction per day. DYFS filed a petition with the Commissioner of Education for declaratory judgment to determine the validity of the Commissioner's action.

The exclusion was reviewed by the Medical Advisory Panel, which had been constituted under the Commissioner's guidelines. The Panel considered letters and evaluations submitted by I.C.'s and the school's doctor, as well as written psychological evaluations from two other doctors. In addition, the school's physician personally appeared before the Panel. Dr. Oleskie, I.C.'s treating physician, recommended the admission of I.C., concluding that the student did not pose a risk of transmission to others in the school environment. Dr. John E. Hampton, the school's medical inspector, recommended that I.C. be excluded as a result of her reduced immunity to infection. The Plainfield Board had no contact with the panel throughout its deliberation process.

On October 2, 1985, the Panel concluded that the data that it considered "describe no tendencies toward behavior which could possibly be related to spread of infection." The Panel then issued a decision directing that the Plainfield Board "immediately admit I.C. to regular classroom attendance in the same manner and on the same basis as [it] would admit any other child eligible for school attendance." Although I.C. was neurologically impaired and thus being evaluated for possible classification as educationally handicapped, the Commissioner ordered the board not to use this as an excuse "for not placing I.C. in a regular classroom environment."

The Plainfield Board responded by requesting an additional 30 days to determine the appropriate placement of the child. Notwithstanding this request, on October 10 the Division of Youth and Family Services brought an action in Superior Court, Chancery Division, to enforce compliance with the Commissioner's order. On October 15, 1985, prior to the return date of the

order to show cause issued by the Chancery Division, the Commissioner responded to the Plainfield Board's "30 day" request. The Commissioner's letter stated that even if I.C. is to be classified for a special education program, she should be placed in regular kindergarten class pending transfer to a special class within the school. I.C., the Commissioner ordered, was to be admitted to school no later than October 21.

On October 17, the Plainfield Board appealed the Commissioner's September 3 guidelines and October 3 order. The Appellate Division, with the consent of both parties, transferred the appeal to the State Board of Education. On October 31, 1985, the Chancery Division ordered I.C. admitted to school immediately but stayed its order until November 8. The State Board affirmed the Commissioner's order on November 8. In addition the State Board determined that in accordance with *N.J.A.C.* 6:2–1.14, "oral argument [was not] necessary in order for it to arrive at a fair determination of the case." Due process, the Board concluded, "does not require a trial type hearing as to non-factual issues; trial procedure is not required on issues of law, policy or discretion. Thus, once the medical determination was made that I.C.'s conditions did not warrant excluding her from school," the Commissioner was within his authority to direct I.C.'s admittance. The Plainfield Board appealed the State Board's decision to the Appellate Division.

The appeal was joined with the case of "Jane Doe," a five-year old child diagnosed as having ARC who was refused admission to kindergarten by the Washington Borough Board of Education. The Medical Advisory Panel, after considering behavioral and pathological data and the oral testimony of one physician, concluded that Jane Doe should be admitted to school. When the school board refused the Commissioner's order to admit Jane Doe, a Chancery Division action ensued and the Appellate Division granted leave to appeal under *Rule* 2:2–3(b).

The Appellate Division issued its opinion in these appeals on March 15, 1986. *Board of Educ. of City of Plainfield v. Cooperman,* 209 *N.J.Super.* 174. The court held that the Commissioner's "Policy Guidelines" were of such widespread, continuing and prospective effect as to amount to administrative rules, which should have been promulgated under formal rulemaking procedures. *Id.* at 205. Because the proceedings regarding I.C. and Jane Doe were conducted pursuant to invalid guidelines, the order requiring the immediate admittance of the two students was reversed and remanded to the Commissioner for hearings.

In addition, the Appellate Division concluded that the proceedings held pursuant to the Commissioner's guidelines violated "fundamental due process." Neither the local school boards nor the excluded children were provided the opportunity to be heard or to present or cross-examine witnesses regarding their written reports. *Id.* at 210–14.

The Appellate Division next addressed the issue of whether the students should be admitted to the classroom pending "a sufficient showing of a potential risk of exposure to contagious disease." The Appellate Division concluded that the hearings should precede the admission of the children to the classroom. *Id.* at 216.

Judge Gaulkin, concurring in part and dissenting in part, disagreed with the majority's decision to stay the admission of I.C. and Jane Doe pending new hearings. He reasoned that "[t]he Boards have made no showing at all, much less a sufficient one, to justify the continued infringement of the constitutional rights of these children." *Id.* at 220.

## II.

As to the two children for whom this action was originally brought, this case is moot. I.C. was admitted to a class for neurologically impaired children after a stipulation of dismissal was concluded between the Plainfield Board of Education and

the DYFS. Jane Doe has since moved from Washington Borough. Thus, hearings regarding the admission to school of these two children are no longer necessary.

On August 4, 1986, the State Board of Education proposed new regulations under the formal rulemaking procedures mandated by the Appellate Division. 18 *N.J.R.* 1509. After receipt and consideration of public comment, the State Board of Education adopted (with minor modifications) the proposed rules. The adopted rules were filed October 7, 1986, and effective November 3, 1986. 18 *N.J.R.* 2206. The related regulation by the Commissioner of Health was proposed August 4, 1986, and filed without change September 12, 1986, to be effective October 8, 1986. 18 *N.J.R.* 1512(a), 2014(a). The two regulations are codified at *N.J.A.C.* 6:29–4.4, 8:61–1.1.

The appellant boards of education argue that the power to exclude students from public schools due to health reasons resides in the schools and the local school boards. They argue further that this power cannot be overridden by the Commissioner. Appellants cite statutory provisions, *N.J.S.A.* 18A:40–7, 18A:40–10, 26:4–6, which indicate that teachers, principals, and local boards of education have some discretion to exclude children with contagious diseases from the classroom.

The Commissioner argues that while these statutes do place power in local school officials, that power is limited by two sets of constraints. First, the power must be exercised reasonably. Like other government actors, the school board cannot act in an arbitrary fashion, especially when a child's right to an education is at stake. Reasonableness in the present context clearly involves appropriate deference to medical expertise. In the case of Jane Doe and I.C., all the medical experts and medical authorities agreed that the presence of the AIDS virus in the children did not by itself pose any danger to other children or to the child the board wished to exclude.

The second set of constraints on local school officials is the preemptive regulations of the State Commissioner and State

Board of Education adopted pursuant to the school laws. Local boards of education must act in conformity to the regulating guidelines promulgated by the Commissioner and the State Board of Education as part of their duties to execute the Education Clause of the New Jersey Constitution, N.J. Const. of 1957, art. VIII, § 4, para. 1, and the state policy of compulsory public education. The State Department of Education "shall make and enforce, and may alter and repeal, rules ... for implementing and carrying out the school laws of this state...." *N.J.S.A.* 18A:4–15. "Accordingly, there can be no doubt that the Department of Education 'enjoys broad legislative rule-making powers.' *D.S. v. East Brunswick Twp. Board of Education*, 188 *N.J.Super.* 592, 598 (App.Div.1983), certif. den., 94 *N.J.* 529 (1983)." *Cooperman, supra,* 209 *N.J.Super.* at 201 n. 9.

The authority granted the Commissioner to promulgate regulations and to resolve disputes has always been interpreted broadly. "There is lodged with the Commissioner encompassing responsibility over public education and broad authority to supervise all public schools, *N.J.S.A.* 18A:4–23.... The Commissioner also has fundamental and indispensable jurisdiction over all disputes and controversies arising under the school laws. *N.J.S.A.* 18A:6–9." *Hinfey v. Matawan Regional Board of Education,* 77 *N.J.* 514, 525 (1978). *See, e.g., Abbott v. Burke,* 100 *N.J.* 269, 301 (1985) (power to hear a challenge to the Public School Education Act of 1975); *Hinfey v. Matawan Regional Board of Education, supra,* 77 *N.J.* 514 (power to resolve a claim of sex discrimination in the area of public school curricula); *Robinson v. Cahill,* 69 *N.J.* 449, 459–61 (1976) (power to implement the constitutional guarantee of a "thorough and efficient" school system); *Booker v. Board of Education, Plainfield,* 45 *N.J.* 161 (1965) (board powers to deal with the problem of school segregation). Though the authorizing statute does not speak specifically of the power to promulgate regulations on the issue of excluding children from the classroom due to health reasons, that specific power can be

inferred from the broad powers that are granted to the Department. *See New Jersey Guild of Hearing Aid Dispensers v. Long*, 75 *N.J.* 544 (1978). The regulations in question fit within this context: they are thoughtful efforts intended to protect both school children's health and school children's right to a public education.[2]

## III.

The regulations promulgated by the State Board of Education establish the following procedures for any exclusion from school of Human Immunodeficiency Virus (HIV) infected children. The board can exclude the pupil only under very limited circumstances. First, exclusion is allowed if the district medical officer, the pupil's parent(s) or guardian(s), and the pupil's physician all agree that the pupil fits the criteria listed in *N.J.A.C.* 8:61–1.1.[3] *N.J.A.C.* 6:29–4.4(e)(1). A HIV-infected pupil cannot be excluded from attending school before the district medical officer concludes that the pupil does fit the regulatory criteria. *N.J.A.C.* 6:29–4.4(b), (e). Once the district

---

[2]In *School Board of Nassau County v. Arline*, —— U.S. ——, 107 *S.Ct.* 1123, 94 *L.Ed.*2d 307 (1987), the United States Supreme Court held that a person afflicted with a contagious disease may be a "handicapped individual" for the purposes of Section 504. *Arline* involved tuberculosis, not AIDS, but the Court's reasoning and holding applied broadly to all contagious diseases and not merely to the specific facts before the Court. This may suggest that the Federal Rehabilitation Act may be relevant to cases involving the exclusion of children with AIDS from public education involving particular programs. Section 504 of the Rehabilitation Act of 1973, 29 *U.S.C.* § 794, provides that no otherwise qualified handicapped individual shall, solely by reason of her handicap, be excluded from participating in any program receiving federal financial assistance.

[3]The criteria are as follows:
  1. The pupil is not toilet-trained or is incontinent, or is unable to control drooling.
  2. The pupil is unusually physically aggressive with a documented history of biting or harming others. [*N.J.A.C.* 8:61–1.1(b).]

medical officer so concludes, the board is authorized to exclude the child from school. *N.J.A.C.* 6:29–4.4(e).

If the district medical officer disagrees with the pupil's physician as to whether the pupil manifests the relevant conditions, the case then goes before the Medical Advisory Panel established by the Department of Health. *N.J.A.C.* 6:29–4.4(f). The district board of education passes on to the Panel all medical information that was before the board, medical information submitted to the board by the pupil's parent(s) or guardian(s), and a recent evaluation of the child's behavior—as that behavior is relevant to *N.J.A.C.* 8:61–1.1.[4] *Id.*

The board has the burden of proof. *N.J.A.C.* 6:29–4.4(f)(5). Each party can submit additional written information; and "[t]he panel shall call for any oral and/or written information it deems necessary for it to reach a determination." *Id.*

The Panel shall render a written conclusion with supporting reasons and analysis included. *N.J.A.C.* 6:29–4.4(f)(6). The parties may file with the Commissioner of Education written exceptions on issues of fact and of law. *Id.* at (f)(8). The Commissioner, after reviewing the Panel's opinion and the filed exceptions, can do one of three things: 1) direct the pupil's immediate enrollment, 2) confirm the board's decision to exclude the pupil, or 3) "[d]etermine that the matter is a contested case and direct that it be transmitted to the Office of Administrative Law for further determinations." *Id.* at (f)(9).

It is contended that the procedures established fail to protect the parties' constitutional rights to due process.[5] The United

---

[4]*See* note 3. During the pendency of these proceedings, the child is provided with home instruction; similarly, if a pupil's exclusion from a school program is eventually upheld, "appropriate education" will be provided. *N.J.A.C.* 6:29–4.4(e)(1), (f)(2).

[5]This applies to the individual parties involved in the dispute, not to the school boards. The school boards are State agencies, public entities whose power are delegated to them by the state legislature. *See N.J.S.A.* 18A:10–1 to

States Supreme Court has described the Due Process Clause as guaranteeing "that deprivation of life, liberty or property by adjudication be preceded by notice and opportunity for hearing appropriate to the nature of the case," *Mullane v. Central Hanover Trust Co.*, 339 *U.S.* 306, 313, 70 *S.Ct.* 652, 656, 94 *L.Ed.* 865, 873 (1950), "the timing and content of the hearing [depending] on appropriate accomodation of the competing interests involved," *Goss v. Lopez*, 419 *U.S.* 565, 579, 95 *S.Ct.* 729, 738, 42 *L.Ed.*2d 725, 737 (1975).

In *Mathews v. Eldridge*, 424 *U.S.* 319, 96 *S.Ct.* 893, 47 *L.Ed.* 2d 12 (1976), the Supreme Court offered three factors to be considered in evaluating whether a particular procedure is sufficient to satisfy the requirements of due process:

first, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail. [*Id.* at 335, 96 S.Ct. at 903, 47 *L.Ed.*2d at 33.]

The interests at stake include the pupil's interests in receiving an education and having that education be in a classroom setting, the concurring government interest that children receive an education and having that education be in a classroom setting, and the government's interest in protecting its citizens from dangerous diseases. *See* N.J. Const. of 1947, art. VIII, § 4, para. 1 (constitutional right to an education); *Goss v. Lopez*, 419 *U.S.* 565, 95 *S.Ct.* 729, 42 *L.Ed.*2d 725 (1975) (due process protections against suspension from school); *Jacobson v. Massachusetts*, 197 *U.S.* 11, 25 *S.Ct.* 358, 49 *L.Ed.* 643 (1905) (compulsory vaccination) (societal interests in health sometimes overcomes individual rights). Both the interest in education and the interest in public health underscore the importance of

18A:12–20. Because school boards are themselves agents of the State, it would be a misstatement in this context to ascribe to school boards due process rights against improper state action.

having accurate proceedings, and speedy hearings to the extent that such is compatible with accuracy. The government also has an interest in relatively informal hearings to reduce the fiscal and administrative burdens of the procedures.

In evaluating how well the procedures in question serve the interests mentioned, we use as a guidepost Professor Davis' list of four elements necessary to a fair trial:

> (1) adequate notice, (2) a chance to know the opposing evidence and argument and to present evidence and argument in response, (3) a chance to confront and to cross-examine adverse witnesses, and (4) an impartial deciding officer. [2 K. Davis, *Administrative Law Treatise* § 10:6, at 327 (2nd ed. 1979).]

■ No problem of notice exists because the procedure commences only after it is determined that the board's medical inspector disagrees with the pupil's physician on whether the child fits the relevant criteria. *N.J.A.C.* 6:29–4.4(e)(2). The regulations contain procedures through which the pupil's parent(s) or guardian(s) are informed of the opposing evidence and argument, *id.* at f(1)(vii), and through which that party can present evidence and argument in response, *id.* at (f)(5)(iii). There is little doubt that the Panel is an impartial deciding body. *See N.J.A.C.* 8:61–1.1(e) (composition of the Panel).

The regulations do not contain an explicit authorization or prohibition of cross-examination or the right to produce witnesses. However, those overseeing the hearings have discretion in the conduct of hearings. *See N.J.A.C.* 6:29–4.4(f)(5)(ii) (the Panel hearing); *id.* at (f)(9)(iii) (the hearing before the Office of Administrative Law ordered by the Commissioner).

The Appellate Division determined that both the school children and the school boards have the right to present witnesses and to engage in cross-examination. *Cooperman, supra,* 209 *N.J.Super.* at 212–13. We note and emphasize that the discretion delegated under the rules to the Medical Panel expressly includes the power to allow any party to call witnesses and to allow cross-examination. *N.J.A.C.* 6:29–4.4(f)(5). In cases where the child's admissibility is being disputed, the contested issues will almost always be fact-sensitive. *See N.J.A.C.* 6:29–

4.4(f). Because of the importance of the rights at stake as well as the dire consequences that could result from an erroneous decision, the right to call witnesses with the attendant right of cross-examination must be provided automatically upon the request of the parties.

In sum, the discretionary authority delegated to the Medical Panel under the regulations promulgated by the Commissioner expressly and impliedly imports the obligation to summon witnesses with the attendant right of cross-examination on its own initiative or upon the application of any party before it. As construed, the regulations prescribing this discretionary authority are clearly sufficient to protect the constitutional and statutory interests implicated by the proceedings that will be conducted under these regulations.

## IV.

In view of the fact that, pursuant to the Appellate Division's judgment, the Commissioners of the Department of Education and the Department of Health have promulgated formal regulations, the judgment is modified, and as modified is affirmed, and further, the regulations, as interpreted herein, are upheld.

*For modification and affirmance*—Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7.

*Opposed*—None.