606 A.2d 851

IN THE MATTER OF THE COMMISSIONER OF INSURANCE'S
MARCH 24, 1992 ORDER REGARDING THE JANUARY 24, 1992
RATE FILING BY THE MARKET TRANSITION FACILITY OF
NEW JERSEY.

Superior Court of New Jersey
Appellate Division

Argued April 24, 1992—Decided May 1, 1992.

Before Judges R.S. COHEN, A.M. STEIN and KESTIN.

*Michael R. Cole* argued the cause for appellant Chubb Group of Insurance Companies (*Riker, Danzig, Scherer, Hyland & Perretti,* attorneys) in A–4014–91T5F and appellant Allstate Insurance Company (*Smith, Stratton, Wise, Heher & Brennan* and *Foulkrod Reynolds & Havas,* attorneys) in A–4012–91T5F (*S. Walter Foulkrod, III, pro hac vice, John J. Degnan, Lawrence C. Johnson,* and *Louis Nagy,* of counsel; *Michael R. Cole, Suzanne M. McSorley, Thomas E. Hastings* and *James C. Meyer,* of counsel and on the brief).

*Julius B. Poppinga* argued the cause for appellants Atlantic Employers Insurance Company, Pacific Employers Insurance Company, Colonial Penn Insurance Company (*McCarter & English,* attorneys); Lumbermens Mutual Casualty Company, American Manufacturers Mutual Insurance Company, American Motorist Insurance Company, American Protection Insurance Company, Transamerica Insurance Company, Utica Mutual Insurance Company (*Bressler, Amery & Ross,* attorneys); Liberty Mutual Insurance Company (*Cuyler, Burk & Matthews,* attorneys) in A–4015–91T5F; and appellant Continental Insurance Company (*Shanley & Fisher,* attorneys) in A–4011–91T5 (*Julius B. Poppinga* of counsel and on the brief, *Rosalie Burrows, Gerard G. Brew, Cynthia J. Borrelli, Anne Mohan,* and *William Becker,* on the brief).

*Susan Stryker* argued the cause for appellant Aetna Casualty and Surety Company in A–3784–91T5F (*Hannoch Weisman,* attorneys, *Susan Stryker* and *Mark F. Horning, pro hac vice,* on the letter brief).

*Thomas P. Weidner* argued the cause for appellant State Farm Mutual Automobile Insurance Company in A–4013–91T5F

(*Jamieson, Moore, Peskin & Spicer,* attorneys, *Thomas P. Weidner* on the letter brief).

*Joseph L. Yannotti,* Assistant Attorney General argued the cause for respondent (*Edward J. Dauber,* Acting Attorney General, attorney, *Joseph L. Yannotti* of counsel, *Sharon M. Hallanan, Thomas M. Hunt, Adam Scaramella, Katherine G. Motley,* and *Donald Bunda,* Deputy Attorneys General, on the brief).

*Wilfredo Caraballo,* Public Advocate, (*Theresa Brown,* Deputy Public Advocate, on the letter brief).

*Clapp & Eisenberg,* attorneys for *amicus curiae* American Insurance Association (*Elmer M. Matthews* of counsel and on the letter brief, *Frederic S. Kessler* on the letter brief).

The opinion of the court was delivered by

R.S. COHEN, J.A.D.

These are appeals by some 20 companies that write most of the auto insurance in New Jersey. They challenge the validity of Order No. A92–158, issued by the Commissioner of Insurance on March 24, 1992 ("the Order"). The Order declines to implement an April 1, 1992 rate increase requested by the Market Transition Facility ("MTF") to meet a premium shortfall. It creates instead (by amendment of the MTF Plan of Operation) a program of "transitional assessments" against insurers which violated the law, in the Commissioner's view, by failing to write their shares of MTF depopulation business. The total amount to be assessed is some $169,000,000, of which $37,000,000 is to raise MTF revenues sufficiently to obviate the need for the April 1 rate rise, and $132,000,000 is to defray part of the MTF deficit accumulated between October 1, 1990 and April 1, 1992. The Commissioner says he plans to make calls for assessment payments in May or early June 1992.

The appellants moved for stays of the Order and for acceleration of their appeals. The need for a prompt decision was apparent to all parties. On April 10, without objection, we

ordered that briefs be exchanged on April 20 [1] and that oral argument be heard on April 24. Even though implementation of the proposed assessments required amendment of the MTF Plan of Operation, the matter was treated as ripe and ready for adjudication. We were advised that the Commissioner would adopt the amendment before April 24, and indeed he did so. The issues relating to the validity of the amendment have been fully briefed, and all parties have treated them as an integral part of these appeals. Acceleration of the appeals made less urgent the insurers' motions for stays, and we denied them.

We now hold that the Order is invalid for two reasons. The first is that the Commissioner's determination that there is an MTF rate need of 12.6% requires him to raise rates. The law does not permit him to purposely set deficit rates and rely on the alternative funding source of a cash call to the voluntary market insurers. The second is that imposing transitional assessments on certain insurers on the thesis that they did not meet their depopulation apportionment shares is unauthorized by statute, either to prevent future deficits or to reduce past deficits. Accordingly, we order the Commissioner to implement forthwith the 12.6% MTF rate increase already found by him to be necessary.

In 1983,[2] the New Jersey Automobile Full Insurance Availability Act, *N.J.S.A.* 17:30E-1 *et seq.*, created a residual auto

---

[1]The briefing schedule we ordered was very short and included a holiday weekend. It thus called upon all of the attorneys for extraordinary efforts in very demanding circumstances. Without exception, the attorneys performed responsively to our order and the highest professional standards.

[2]Rather than recapitulate the history of the dysfunction market in New Jersey, we refer the reader to *State Farm Mu State,* 124 *N.J.* 32, 590 *A.*2d 191 (1991); *In re Revision,* 256 *N.J.Super.* 46, 606 *A.*2d 401 (App.Div Orders Regarding Rate Filing by Market Transition Facility, *599* A.*2d 906 (1991),* certif. denied, *127* N.J. *56376 (1992);* In re Assignment of Exposures, *248* N.J.Super. *367, 591* A. *denied,* 126 *N.J.* 385, 599 *A.*2d 162 (1991), *cert.*S.Ct.

insurance market mechanism that came to be called JUA. Its function was to assure access to auto insurance at standard market rates to qualified persons who, for good reason or bad, were rejected by voluntary market insurers. *In re Comm'r of Ins. Orders Regarding Rate Filing by Market Transition Facility,* 252 *N.J.Super.* 260, 263–64, 599 *A.*2d 906 (1991), *certif. denied,* 127 *N.J.* 565, 606 *A.*2d 376 (1992) [hereinafter *Market Transition Facility* ]. JUA was not a success. It became the dumping ground for rejected drivers. Ultimately, half of New Jersey's auto policies were issued by JUA. Although many JUA insureds were perfectly good drivers, many of them lived in areas which the insurers believed created uncompensated extra risks.

JUA was instructed by the Legislature that created it to operate on a no profit, no loss basis. *N.J.S.A.* 17:30E–3*o*; *N.J.S.A.* 17:30E–8. Although it could not initially charge premiums which exceeded standard market rates,[3] the statute provided revenue supplements that were supposed to make up the difference. The principal supplement was the residual market equalization charges (RMECs). They were not assessed to insurance companies, but were added equally to the premiums on almost all insured automobiles, and transmitted to JUA by the insurers. The RMECs were to be periodically set by the Commissioner, *N.J.S.A.* 17:30E–8, at a level sufficient to "cause [JUA] to operate on a no profit, no loss basis." *N.J.S.A.* 17:30E–3*o*; *see State Farm, supra,* 124 *N.J.* at 41–42, 590 *A.*2d 191; *Market Transition Facility, supra,* 252 *N.J.Super.* at 264, 599 *A.*2d 906; *Assignment of Exposures, supra,* 248 *N.J.Super.* at 372–73, 591 *A.*2d 631.

---

1244, 117 *L.Ed.*2d 476 (1991); and *Allstate Ins. Co. v. Fortunato,* 248 *N.J.Super.* 153, 590 *A.*2d 690 (App.Div.1991).

[3]In 1988, the statute was amended to permit four annual 10% increases for unsafe drivers. *L.* 1988, *c.* 156, § 1; *see N.J.S.A.* 17:30E–13.

JUA was not operated as the statute directed. Fingers have pointed everywhere: the RMECs were knowingly set too low; the servicing carriers overspent JUA money negligently and in their own interests; the voluntary market rejected all but the lowest-cost drivers. Whatever the true causes, JUA ran up some $3.3 billion in deficits not contemplated by the break-even statutory scheme. The result was the need for the assessments, surcharges, and other non-premium revenue supplements created by the Fair Automobile Insurance Reform Act of 1990 ("FAIR Act"), *L.* 1990, *c.* 8, *N.J.S.A.* 17:33B–1 *et seq.* See *State Farm, supra,* 124 *N.J.* at 42, 590 *A.*2d 191.

Even earlier, in 1988, it was clear to the Legislature that the bloated JUA had to be put on a crash diet. *N.J.S.A.* 17:30E–14 was amended to create a plan for the gradual depopulation of JUA over a period of four years beginning January 1, 1989. *L.* 1988, *c.* 119, § 25. From the then current coverage of 50% of the private passenger car market, JUA was to be downsized in yearly stages to cover 40%, 30%, 25%, and then 20% of the market. The final 20% were to be insured through JUA at self-sustaining, unsubsidized rates. The other side of the coin was to be an annual increase in the voluntary market to cover 60%, 70%, 75%, and finally 80% of the market. *See Assignment of Exposures, supra,* 248 *N.J.Super.* at 374, 591 *A.*2d 631.

The 1988 amendment to *N.J.S.A.* 17:30E–14 created a mechanism to downsize, or depopulate, JUA. It instructed the Commissioner to establish rules "to govern the voluntary writing" of JUA insureds by the voluntary market insurers. *N.J.S.A.* 17:30E–14a. Those rules were to include assignment of eligible insureds by JUA to member companies "pursuant to an equitable apportionment procedure established in the plan of operation." *Id.* Due consideration was to be given to the increase or decrease in voluntary market policies written by member companies since January 1, 1984. *Id.*

Then, according to 17:30E–14b, the Commissioner was to "establish" a first-year voluntary market quota of not less than

60% of all the insured passenger cars, and was to "prescribe" the number of voluntary market policies each member company was to write during that year. Similarly computed but increasing yearly quotas and apportionments were to follow. At the end of each year, the Commissioner was to direct JUA to "assign the balance of the exposures needed to meet the applicable quota to member companies in a manner consistent with the apportionment procedure." *N.J.S.A.* 17:30E–14c. Any member company that did not timely write its share of JUA depopulation business was to "be precluded from nonrenewing automobile policies pursuant to [*N.J.S.A.* 17:29C–7.1] during the immediately following 12 month period." *N.J.S.A.* 17:30E–14h. The bracketed provision permits insurers to decline to renew up to 2% of their voluntary business each year.

The Commissioner was authorized to suspend or revoke the certificate of authority of any insurer who willfully failed to comply with the 1983 or 1988 legislation, and to fine any insurer who violated the Act or the plan of operation adopted pursuant to it, up to $10,000 for each violation. *N.J.S.A.* 17:30E–17a. In addition, the 1988 legislation also authorized the Commissioner to order the restitution to JUA of any financial loss due to any act or omission of any member company violating any statutory, contractual or plan of operation requirement. *L.* 1988, *c.* 156, § 11; *see N.J.S.A.* 17:30E–17.1.

Very little depopulation occurred pursuant to the 1988 legislation. The FAIR Act was approved and became effective on March 12, 1990. Its centerpiece was the abandonment of the JUA as a market mechanism,[4] and the creation of the MTF to write auto policies for two years, from October 1, 1990 through September 30, 1992, to depopulate at a rate substantially faster than the schedule established in 1988 for JUA, and to be completely out of business by October 1, 1993, *N.J.S.A.* 17:33B–

---

[4] The JUA was to stop writing policies on September 30, 1990. All of its policies would therefore terminate by September 30, 1991.

11. JUA depopulation was to take place so that no more than 32% of JUA exposures would enter MTF on October 1, 1990. *N.J.S.A.* 17:30E–14b(2); *N.J.S.A.* 17:33B–11c. By April 1, 1991, MTF was to insure no more than 29% of the private passenger market, and by October 1, 1991, no more than 20%. *N.J.S.A.* 17:33B–11c(5). By April 1, 1992, only 10% were to remain in MTF and on September 30, 1992, MTF was to stop covering the remaining exposures, and they were then to be relegated to an assigned risk pool. *Id.; see Market Transition Facility, supra,* 252 *N.J.Super.* at 265–66, 599 *A.2d* 906.

The FAIR Act's provisions creating MTF are almost all contained in *N.J.S.A.* 17:33B–11. MTF is to be "operated by the Commissioner of Insurance pursuant to the provisions of this section." *N.J.S.A.* 17:33B–11a. Every New Jersey auto insurer "shall be a member of the facility and shall share in its profits and losses as provided by the commissioner pursuant to the provisions of subsection d. of this section." *Id.* Subsection d provides:

> The commissioner shall apportion any profits or losses of the facility among member companies based on each company's apportionment share as determined for purposes of depopulation pursuant to subsection a. of section 26 of *P.L.*1983, *c.* 65 (C. 17:30E–14).

Subsection a of *N.J.S.A.* 17:30E–14 states:

> Within 45 days of the effective date of this 1988 amendatory and supplementary act, the commissioner shall, in the plan of operation, establish procedures to govern the voluntary writing of applicants and [JUA] insureds without the utilization of the association. These procedures shall include criteria identifying drivers who should be eligible for coverage in the voluntary market. Applicants and association insureds meeting these criteria shall be subject to assignment by the [JUA] to member companies, pursuant to an equitable apportionment procedure established in the plan of operation. The procedure shall give due consideration to the increase or decrease in the volume of private passenger automobile non-fleet exposures voluntarily written by member companies in this State since January 1, 1984.

The JUA plan of operation contained a formula to measure each voluntary market insurer's depopulation share. The formula was designed to satisfy the demand of *N.J.S.A.* 17:30E–14a for "an equitable apportionment procedure ... [which] shall give due consideration to the increase or decrease in the

volume of [auto insurance] voluntarily written by member companies in this State since January 1, 1984." In apportioning depopulation obligations based on voluntary market shares, the plan of operation used 1983 and 1988 shares, and weighed them equally. After adoption of the FAIR Act, the Commissioner employed a new formula for depopulation apportionment. He continued to use 1983 and 1988 to measure voluntary market shares, but weighted 1983 volume three times greater than 1988. The purpose was to discount recent reductions in voluntary business, the very business strategy that caused the bloat of JUA's book of business, and to rely more heavily on market shares in the year before JUA opened and gave insurers the opportunity to shift the burden of rejected risks. The new formula was attacked in *Assignment of Exposures, supra,* 248 *N.J.Super.* 367, 591 *A.*2d 631. We concluded that it was "sensible." *Id.* at 386, 591 *A.*2d 631.

The Commissioner calculated voluntary market shares in accordance with the new formula, pursuant to the apportionment procedure established under *N.J.S.A.* 17:30E–14a, as the FAIR Act directed. *N.J.S.A.* 17:33B–11c(5). He notified each insurer of the number of JUA exposures it would have to take on by October 1, 1990 in order for the voluntary market to absorb 68% of the total auto market, leaving MTF to start business on October 1, 1990 with 32% of the total. *N.J.S.A.* 17:30E–14b(2).

The FAIR Act tells the Commissioner what to do if an industry-wide quota is not met. In language that parallels the 1988 amendment of *N.J.S.A.* 17:30E–14c, *N.J.S.A.* 17:33B–11c(5) directs:

> In the event that any of the quotas established pursuant to this paragraph have not been met by the end of the applicable period, the commissioner shall direct the facility to assign the balance of the exposures needed to meet the applicable quota to member companies pursuant to the apportionment procedure.

It is obvious from the statutory context that "quotas" are not the individual insurer's shares, but rather the number of MTF exposures to be absorbed by the entire voluntary market to

meet the industry depopulation goal. It is equally clear that if the industry meets its quota for a time period, no single insurer is subject to assignments, no matter how little it participated in the overall industry effort. Also, if an insurer meets its individual goal, it is not subject to mandatory assignment, even if there is an industry shortfall.

The insurance industry fell short of the October 1, 1990 quota by some 211,000 exposures. On January 24, 1991, the Commissioner issued his first set of mandatory assignment orders, allocating the 211,000 shortfall to insurers that failed to meet their individual goals. The orders did not merely inform the carriers of the number of new policies each of them had to write for depopulation exposures. They went on to assign particular producers' books of business to individual insurers. Thus, the mandatory assignment orders directed each carrier to take on and write policies for particular identified exposures.

There were, however, aspects of the assignment orders which were made the subject of insurers' appeals to this court. The orders directed insurers to take on and insure exposures that presented so great a risk as not to meet the FAIR Act's definition of eligibility for the voluntary market. *N.J.S.A.* 17:33B–13. At oral argument of the insurers' appeals, the Commissioner agreed that the insurers should have to provide coverage only for eligible drivers as defined by the FAIR Act. He declined to investigate and identify the bad drivers for the insurers, but conceded that the insurers should be given time to identify and weed out the ineligibles before offering them policies. *Assignment of Exposures, supra,* 248 *N.J.Super.* at 377–78, 591 *A.*2d 631.

Another problem was that the mandatory orders assigned not only producers' entire books of business, but also the producers themselves. The orders thus violated the plain words of *N.J.S.A.* 17:30E–14i(3), which barred requiring an insurer to write depopulation business through former producers. *Id.* at

380–83, 591 *A*.2d 631.[5]  Although we upheld the mandatory assignment program against many other attacks from the insurers, this one clear defect in the orders and the change the Commissioner agreed to make required that the orders be redone.  *Id.* at 390, 591 *A*.2d 631.

*Assignment of Exposures* was decided on May 20, 1991, less than four months after the date of the assignment orders.  The Commissioner did not issue any replacement assignment orders until early January 1992.  Depopulation stalled.  Some insurers made successful efforts to attract MTF insureds.  Some made efforts that only partially succeeded.  Others did not try at all.

Meanwhile, it was becoming obvious that MTF was accumulating huge deficits.  It had started operating with premium rates tied to the grossly inadequate JUA rates, *N.J.S.A.* 17:33B–11c(2), and without JUA's revenue supplements, such as the $222 annual RMECs imposed on almost every New Jersey auto.  The Commissioner did not adjust MTF rates in response to an avalanche of actuarial evidence that the facility was operating unsoundly.  *See Market Transition Facility, supra,* 252 *N.J.Super.* at 267–68, 599 *A*.2d 906.

In January 1991, MTF sought a 28% rate rise, an amount which MTF conceded was less than the indicated need.  On May 10, 1991, just before we invalidated the mandatory assignment orders, the Commissioner granted an 18.6% rise, and issued an opinion questioning the validity of the actuarial opinions that it was not enough.  *Id.* at 269–70, 599 *A*.2d 906.  The increase was to take place on June 15, 1991.  However, its ultimate effect was overestimated, and the rise was only 12.3%.

---

[5]The Commissioner found himself faced with the clear prohibition of producer assignment contained in *N.J.S.A.* 17:30E–14i(3) and the later task of assuring producer survival imposed on him by *N.J.S.A.* 17:33B–9c.  It was an unfortunate legislative combination.  We ruled that the Commissioner had no power to ignore the prohibition in making depopulation assignments, and we invited the Legislature to consider the problem.  248 *N.J.Super.* at 380–83, 591 *A*.2d 631.

Allstate, Aetna and Liberty Mutual appealed the May 10, 1991 rate rise as insufficient. In the November 1991 *Market Transition Facility* decision, we ordered the Commissioner to develop a procedure to take immediate steps to review and evaluate MTF rates. We did so on the basis of the Commissioner's legal obligation not to select deficit rates as a matter of policy, "and later send apportioned bills to the member insurers." *Market Transition Facility, supra,* 252 *N.J.Super.* at 274, 599 *A.*2d 906.

The Commissioner did not argue that he could purposely set MTF rates at deficit levels. In explaining why he only partially granted MTF's admittedly insufficient request for higher rates, the Commissioner denied he had "underfunded the MTF deliberately," and expressed his "commitment to operate the MTF on a no profit, no loss basis." *Id.* at 271, 599 *A.*2d 906. In his appellate brief he described his "dedication" to that proposition "in fulfillment of his perception of the legislative intent." *Id.* at 275, 599 *A.*2d 906. We concluded, however: "Although he does not argue that he has that authority [to set rates at deficit levels], it is useful to rule clearly that he does not." *Id.* at 275, 599 *A.*2d 906.

After our decision, the Commissioner promptly took effective steps to review the adequacy of MTF rates. Within a month, he ordered an interim increase of 14.9% to take effect on January 15, 1992, pending his review of a rate filing to be made shortly by MTF. That filing was made on January 24, 1992, and sought a further 16.8% rate rise. After departmental study and a comment period, the Commissioner issued the March 24, 1992 order that is the subject of these appeals.

The Commissioner decided that the indicated rate need was 12.2%, plus .4% for a prospective eligibility point forgiveness program. He did not, however, adopt any part of the 12.6% rate need he found. Instead, he maintained the inadequate current rates and amended the MTF plan of operation to create a new device, which he called "transitional assessments." They

were to be imposed on member companies to the extent of their shortfalls in individual depopulation shares.

Each member company would be assessed at the rate of $180 per six-month period for each MTF exposure it was expected to, but did not, depopulate. The amount of the assessments was ordered not to be included in any rate filing by a member company. The costs are therefore nonrecoverable, and must be absorbed by the companies. About $132,000,000 of the assessments was to partly reduce MTF's accumulated deficit. Another $37,000,000 was to prevent further MTF deficits by substituting for the 12.6% rate rise beginning April 1.

In a thorough opinion explaining his decisions, the Commissioner makes four major points. One of them is simply stated and plainly true. It is that, since October 1, 1990, he had already raised MTF rates 42.3%; the high premiums were "straining the pockets of those lawful drivers" who were trapped in MTF, without access to the voluntary insurance market. We note further that, as MTF phases out, the smaller number of remaining insureds may be unfairly burdened with MTF costs which may not decrease proportionately.

The Commissioner's second point is that the companies which did not meet their depopulation responsibilities contributed extra costs to MTF, complying companies, and the public, and should have to bear the burden of those costs. The third point is that companies that did not meet their depopulation responsibilities are not in compliance with the law, and, for that reason, should bear the financial consequences of their noncompliance. Fourth, the Commissioner asserts that he has the authority to impose transitional assessments in lieu of raising MTF premium rates. These last three points deserve further discussion.

There is no question that a faster pace of depopulation would have lowered MTF deficits. It would be hard to find a class of MTF exposures that has been a money-maker. It would also be hard, however, to fix or allocate responsibility for MTF's deficit, which was $375,000,000 by October 1, 1991, and is doubtless

greater now. The Commissioner has continually pointed his finger at the servicing carriers for losses JUA suffered. Many of them act for MTF in the same capacity. Although the Insurance Department probably learned lessons from the experience of JUA, it is not clear whether the practices of the servicing carriers have radically changed.

Viewed from another angle, the responsibility for MTF deficits belongs to government itself. The FAIR Act started MTF out on an unstable financial footing, and gave the Commissioner rate-setting authority. Since premiums were MTF's only revenue source, the Commissioner's responsibility was to predict MTF's rate needs to operate on a break-even basis, and to meet them with rate increases. Increases, however, would disappoint popular hopes that the FAIR Act would reduce high auto premiums. The cost to MTF policyholders of self-sustaining rates would be substantial. In addition, since depopulated MTF insureds can be charged MTF rates by the voluntary market at least until October 1993, *N.J.S.A.* 17:33B–12, a rise in MTF rates affects a good part of the driving public. In the circumstances, it is not surprising that the Commissioner shrank from setting break-even premium rates for MTF insureds.

We also note that, if depopulation had been accelerated by greater voluntary policy writing, the depopulated insureds would doubtless have been the identifiable least-cost risks, skimmed off the top of the MTF pool. Those are the people whose continued presence probably contributed least to MTF costs and deficits. Effective removal of all kinds of insureds from MTF had to be by means of mandatory assignment orders.

The fact is that responsibility for the gap between MTF revenues and expenses is a shared one, and cannot fairly be loaded on one set of shoulders.

The Commissioner's third point is that the companies that failed to take on their depopulation shares are lawbreakers and

should pay the costs of their violations. That position is not consistent with the fact that the transitional assessments are imposed on a no-fault basis. It does not matter if company "A" tried its best and failed to attract sufficient MTF insureds while company "B" thumbed its nose at the depopulation program. Each is assessed the same unit amount on its shortfall, and each must swallow the assessment.

The March 24 Order focuses on insurers that "refuse to obey the law"; on "noncomplying companies' failure to obey the law"; on "insurers which have failed to comply with statutorily required depopulation requirements"; on "systematic and obstinate refusal by some insurers"; and on "insurers which were unjustly enriched" by not sharing depopulation burdens. It is on the basis of these descriptions that the Commissioner justifies the transitional assessments. However, the image of a lawbreaking industry is not an accurate one. Examination of the statutes and the MTF plan of operation undercut that justification.

*N.J.S.A.* 17:33B–11c(5) required the Commissioner to adopt a plan containing periodic industry quotas and mandatory assignments to member companies in the event of an industry shortfall. The adopted plan of operation did just that. It authorized the Commissioner to establish "aggregate voluntary market quotas" and member companies' "apportionment shares," calculated according to their voluntary market shares. At the end of a quota period, the performance of the industry and of each member company is determined. Whether or not the industry meets its quota, the Commissioner orders any member company with an individual shortfall not to exercise its right to nonrenew 2% of the policies in its voluntary book of business. *See N.J.S.A.* 17:30E–14h. In addition, if the industry does not meet its quota, the Commissioner assigns to each member company with an individual shortfall an allocation of sufficient policies, limited to its shortfall, to bring the industry up to its quota. If the industry does meet its quota, no such assignments are made. The March 24 Order and amended plan of operation add

the transition assessments of $180 for each exposure shortfall per quota period, and prohibit inclusion of the assessment in any rate filing. There may be "deferral, abatement or exemption" if a company would be placed in an "unsafe or unsound financial condition."

There are several important elements of this scheme. First, the industry has "quotas," and the insurers only "shares." Second, nowhere in the statute or MTF plan of operation is each insurer *required* to write its share of the voluntary market quota prior to receiving a mandatory assignment. Third, neither the statute nor the plan (until March 24, 1992) visits any consequences on a carrier with a shortfall other than exposure to *an order* barring nonrenewals; and, only if the industry does not meet its overall quota, exposure to *an order* assigning sufficient identified policies to make up the shortfall.

An insurer has no obligation to take on enough MTF exposures to meet its apportionment share. It is not *ordered* to do so, pursuant to the statute or the plan. A possible reason is that the insurer has no power to *order* MTF insureds to sign up with it, or even to create inducements for them to do so. Only MTF, at the Commissioner's direction, has the power to make its insureds switch to voluntary market insurers. The role of the mandatory assignment orders is not only to coerce insurers, but also to coerce policyholders.

There are purposes to individual apportionment shares. One is to let an insurer know what it has to do to avoid the nonrenewal prohibition. The other is to encourage insurers to make efforts to skim off the best MTF risks and thus avoid random assignment of exposures if the industry misses its quota.

If an insurer did not sign up MTF exposures assigned to it (which did not decline coverage), it would violate an order to do something within its power to do, and could be treated appropriately. An insurer that does not meet its apportionment share, however, violates no duty, no law, and no order of MTF or the

Commissioner. The FAIR Act's depopulation plan would be better served by widespread industry cooperation, but an insurer cannot be penalized for waiting for a proper mandatory assignment order, as the statute provides.

How much less subject to such reprisal are insurers that tried, but with only partial success, to cooperate in depopulating MTF? [6] They are swept up with the standpatters and the nosethumbers, and are handed nonrecoverable assessments for not doing successfully what only a mandatory assignment order could accomplish.

The Commissioner's fourth point is that he has the authority to impose transitional assessments in lieu of raising MTF rates. He sees the source of that authority in his "residual power," and in his statutory authority to include in the MTF plan of operation "such other provisions as are deemed necessary for the operation of the facility." *N.J.S.A.* 17:33B–11c(9). In the Order, the Commissioner explained that, although his authority to issue mandatory assignment orders was "important and useful in achieving the depopulation goals, [he did] not interpret it to exclude other methods of promoting depopulation or to prohibit other penalties or assessments." In sum, the Commissioner concluded that he was authorized as chief executive officer of MTF "to direct its members in a reasonable manner to achieve the legislative goals...."

Discussing the fourth point requires clarification of the nature and impact of the transitional assessments. The assessments are against insurers that failed to satisfy depopulation goals that they were never ordered to meet.[7] They are levied on a no-fault basis, without regard to whether individual insurers tried to comply. They are levied for failure to do something

---

[6]We do not know if such insurers really exist. Some of the appellants tell us so, but there have been no factual hearings to test their assertions.

[7]There have been recent mandatory assignment orders, but it is not for noncompliance with them that the assessments are levied.

that individual carriers may or may not have had the power to do, that is, shift MTF exposures into the private market by inducement alone.

The burden of the assessments fall on the insurance companies. They may not be treated as company expenses or passed on for absorption by the insurance market. Thus, the assessments do not serve to spread the cost of MTF deficits throughout the community, but rather to concentrate it on certain companies. The assessments raise revenue, but the Commissioner's justification for them, and the feature of nonrecoverability of the cost, show that their primary purpose and effect is to exact penalties for noncompliance with depopulation plans.

The defect in the transitional assessments is that they differentially burden some insurers with the cost of an interim subsidy of MTF rates on the basis of questionable factual and legal conclusions, without the opportunity for hearings on individual liability, and without statutory authority.

The Commissioner's responsibility is to set break-even rates for MTF. *Market Transition Facility, supra* at 273–75, 599 *A*.2d 906. That does not mean that there never can be a deficit resulting from operations, but it does mean that the Commissioner may not purposely set rates at a deficit level. By declining to raise rates to meet the indicated need of 12.6%, the Commissioner proposes to maintain insufficient rates and collect the rest, on a nonrecoverable basis, from some insurers. That violates the law and contradicts what the Commissioner used to say was "his perception of the legislative intent." *Id.* at 275, 599 *A*.2d 906.

In addition, the FAIR Act plainly directs the Commissioner to apportion profits or losses among member companies based on apportionment shares calculated pursuant to *N.J.S.A.* 17:30E–14. *N.J.S.A.* 17:33B–11d. Differential assessments apportioned according to failure to cooperate violate that rule.

Moreover, the FAIR Act provides a pattern of remedies for failures of depopulation. There are no penalties for industry

failure to meet depopulation quotas, or for insurer failure to meet allocation shares. Wisely or unwisely, the 1988 JUA amendments and the 1990 FAIR Act treat those failures solely as steps preliminary to the imposition of mandatory assignment orders. As already noted, if an insurer met its allocation share by skimming the best of the MTF exposures, it could avoid random assignments. If the industry met its quota, it could avoid assignments for all insurers.

There are two themes here. One is that there is no discernible legislative intent to authorize the Commissioner to retroactively punish conduct that was lawful at the time, even if not cooperative. If such an intent existed, it would be of questionable validity. *See Ralis v. RFE/RL, Inc.*, 770 *F.*2d 1121 (D.C.Cir.1985). The second theme is that there is no discernible legislative intent to authorize the Commissioner to develop novel no-fault penalties in a statutory scheme that already contains civil penalty provisions where the Legislature thought them appropriate. *See N.J.S.A.* 17:33–2; 17:33B–21. Whenever the Legislature intended to create civil penalties for violations of insurance statutes, regulations, and Department orders, it knew how to do so. *See e.g., N.J.S.A.* 17:18–18; 17:22A–17; 17:23A–18; 17:29A–22, –23; 17:29B–7, –11; 17:30E–17; 17:33A–5. Similarly, when the Legislature intended to impose nonrecoverable exactions on insurers in the FAIR Act, it knew how to do so. *See N.J.S.A.* 17:30A–8a(9), –8a(10), –16b; 17:33B–21. Implied remedies are unlikely to be intended by a Legislature that enacts a comprehensive legislative scheme including an integrated system of procedures for enforcement. *Northwest Airlines, Inc. v. Transport Workers Union of Am.*, 451 *U.S.* 77, 97, 101 *S.Ct.* 1571, 1583, 67 *L.Ed.*2d 750, 767 (1981); *Hozier v. Midwest Fasteners, Inc.*, 908 *F.*2d 1155, 1169 (3d Cir.1990). There is ordinarily no implied administrative power to create penalties and remedies. *Commissioner v. Acker*, 361 *U.S.* 87, 91, 80 *S.Ct.* 144, 147, 4 *L.Ed.*2d 127, 130–31 (1959); *Gold Kist v. United States Dep't of Agric.*, 741 *F.*2d 344, 347–49 (11th Cir.1985); *Caldwell Terrace Apartments, Inc. v. Bor-*

*ough of Caldwell,* 224 *N.J.Super.* 588, 593–95, 541 *A.*2d 221 (App.Div.1988); *Sheeran v. Progressive Life Ins. Co.,* 182 *N.J.Super.* 237, 440 *A.*2d 469 (App.Div.1981); *Willner v. Department of Prof'l Reg.,* 563 *So.*2d 805 (Fla.Dist.Ct.App.1990), *rev. denied,* 576 *So.*2d 295 (Fla.1991); 1 Kenneth C. Davis, *Administrative Law Treatise* § 3:11 (2d Ed.1978).

There is another feature of the transitional assessments that could not have been contemplated by the Legislature. It is the fact that the civil penalty effect of the assessments is imposed without the opportunity for any sort of hearing. Such a hearing would provide an opportunity to explore (1) whether the insurer's individual conduct violated any law or regulation, (2) whether the insurer's individual conduct was intentional or unavoidable, and (3) whether the proposed assessment is an appropriate response to the quality and consequences of the insurer's conduct. We pass the question whether the insurers' constitutional rights are violated by the absence of an opportunity for a hearing. We prefer to confine our attention to the intent of the Legislature. Civil penalties can be pursued administratively or judicially, but the New Jersey Legislature has never, to our knowledge, taken the dubious step of authorizing an administrator to impose penalties without any kind of a hearing as to liability or the quantum of penalty. *Cf. State v. Darby,* 246 *N.J.Super.* 432, 437, n. 3, 587 *A.*2d 1309 (App.Div.), *certif. denied,* 126 *N.J.* 342, 598 *A.*2d 898 (1991); *Schaible Oil Co., Inc. v. New Jersey Dep't of Envt'l Protection,* 246 *N.J.Super.* 29, 586 *A.*2d 853 (App.Div.), *certif. denied,* 126 *N.J.* 387, 599 *A.*2d 163 (1991); *New Jersey Dep't of Community Affairs v. Wertheimer,* 177 *N.J.Super.* 595, 527 *A.*2d 592 (App.Div. 1980). *See N.J.S.A.* 2A:58–1 *et seq.; R.* 4:70. There is no reason to supply by implication an authority of doubtful legality that the Legislature has never to our knowledge, given any other administrator.

There is yet another problem with finding implied authority to impose differentiated assessments. It is that the Commis-

sioner may be burdened with too many conflicting roles to play. He is responsible for the operation of MTF as the residual auto insurance market mechanism. In that role he faces perhaps insurmountable tasks in his efforts to fulfill perhaps unreachable goals. He has to deal somehow with gigantic and rising deficits in the operation he heads. It may be asking too much of the Commissioner to expect him to create a fair scheme of assessments that would simultaneously ease the MTF deficit and punish insurers that did not cooperate.

The United States Supreme Court dealt with a similar situation in *Ward v. Village of Monroeville*, 409 *U.S.* 57, 93 *S.Ct.* 80, 34 *L.Ed.*2d 267 (1972). There the Mayor sat as the judge and heard charges of ordinance violations and certain traffic offenses. Fines and costs contributed significantly to annual municipal revenues and supported daily municipal operations for which the Mayor was responsible as chief executive of the municipality. The Supreme Court held that it was a deprivation of due process to subject litigants to the judgment of a court with so substantial a pecuniary interest in the outcome.

Here, again, we do not reach a constitutional decision on the authority of the Commissioner to create and impose penalties/revenue measures that would contribute $169,000,000 to the support of the market mechanism whose financial stability is his responsibility. There is no reason, however, to believe that the Legislature intended to authorize the Commissioner to create a scheme so facially problematical.

In light of all of the conclusions described above, it is impossible to conclude that the Legislature authorized the Commissioner to create the transitional assessments under appeal. On that basis, we must invalidate the amendments to the plan of operation, and order the Commissioner to implement rate increases that will effect a 12.6% increase in MTF revenues.

There are issues presented by this appeal that we have not decided. Some of the carriers have contended that the Commis-

sioner is estopped by various aspects of his conduct to make the transitional assessments. Because we have found the assessments to be invalid on their face, and because consideration of the estoppel arguments would require evidentiary hearings, we have not come to any conclusion on them.

We also have not dealt with insurers' attacks on the Commissioner's justification for choosing the amount of $180 per exposure for each six-month period. Much of it rests on justifications that the Commissioner describes as "intuitively obvious." It is impossible to evaluate on the present record whether the Commissioner's conclusory statements have any quantitative support.

Another issue is the manner in which the assessments were created. They were mentioned in the March 24 Order, but came into actual existence only after the Commissioner adopted the amendments to the plan of operation. The FAIR Act prescribes how the plan of operation may be adopted. *N.J.S.A.* 17:33B–11b. The assessments are not the results of adjudication; they are "rules," within the meaning of *Metromedia, Inc. v. Director, Div. of Taxation*, 97 *N.J.* 313, 328–37, 478 *A.*2d 742 (1984), and are thus ordinarily subject to the procedures required by the Administrative Procedure Act (APA), *N.J.S.A.* 52:14B–4, and invalid if not properly adopted. *Plainfield Bd. of Ed. v. Cooperman*, 209 *N.J.Super.* 174, 202, 507 *A.*2d 253 (App.Div.1986), *aff'd as modified*, 105 *N.J.* 587, 523 *A.*2d 655 (1987).

The Commissioner argues that the FAIR Act supersedes the APA with respect to adoption and amendment of the MTF plan of operation. The difficulty with that answer is that the assessment program may not be a proper part of the plan of operation. *N.J.S.A.* 17:33B–11c contains a list of nine categories of matters that should be treated in the plan of operation. None of the first eight is allocation of MTF deficits. The ninth is the expectable "[s]uch other provisions as are deemed necessary ...," and thus might arguably include that subject. How-

ever, *N.J.S.A.* 17:33B–11d, the provision that immediately follows, provides specifically for the apportionment of MTF profits or losses.

It is thus a very real question whether the serious business of assessing nonrecoverable assessments totaling $169,000,000 can be handled by amending the plan of operation without any kind of public notice. If not, the APA might control. Although the Commissioner did reach out for comment from interested parties before amending the plan of operation, there is nothing before us indicating that all of the APA requirements were satisfied. We come to no ultimate conclusion on this matter because of the ambiguity of the record.

Finally, we make no determinations on the troublesome constitutional issues presented in view of our conclusion that the transitional assessments are unauthorized by statute and are therefore invalid. The Commissioner's responsibility in the absence of a lawful alternative is to implement the rate increase he says is necessary. We order him to do so forthwith.